WRIGHT v. PHIPPS et al.  ATTRILL v. WRIGHT.  DEGRAUW v. ATTRILL.  ATTRILL v. DEGRAUW.  GATES v. SAME.

(Circuit Court, E. D. New York.  October 29, 1898.)

VENDOR AND PURCHASER — MORTGAGE FOR PURCHASE MONEY — FRAUDULENT REPRESENTATIONS—MERGER IN COVENANT—WAIVER—BREACH OF COVENANT —PURCHASE OF OUTSTANDING TITLE—ESTOPPEL—ACTION BY STATE TO RECOVER LAND—LIMITATION.

In 1809, R. purchased lot No. 1, comprising the western end of Rockaway Beach, and in 1814 conveyed the western portion thereof to the state of New York, reserving the right to the drift sedge.  The state did not take actual possession, but by its permission the United States built a blockhouse on the point for the purposes of the war of 1812.  After the close of the war, the United States ceased its use, and the land remained unoccupied, save as R., of whose remaining premises it was an uninclosed continuation, pastured his cattle upon it, as did others, but it was otherwise useless for agriculture.  In 1831 the portion of lot No. 1 not conveyed to the state was sold in foreclosure proceedings.  In 1832, R. died, and there was no recognized occupation of the land in question until 1872.  The deed of lot No. 1 to R. was forgotten or neglected, and was not recorded until 1879, and R.'s deed to the state was not recorded in the office of the secretary of state until 1835, but its existence was not known to any of the parties to this controversy until 1884, when the state asserted title to the property, and in 1885 brought an action of ejectment therefor.  In 1874, in an action of partition, to which the heirs of R., or their successors in interest, were parties, the land was sold to one W., who purchased in the interest of one D., who in 1872 had obtained a lease of the property from the United States.  In 1879, W., through D., sold the land to S. for A., for $200,000, taking back a mortgage for a portion of the purchase price.  In 1881 the mortgage was foreclosed, and the premises purchased in the interest of A., who, through several mesne conveyances, received the deed thereof, subject to a mortgage for $150,000 given for a portion of the purchase money.  A., W., and D., in co-operation, defended the action of ejectment brought by the state in 1885, denied the title of the state, and alleged the validity of the title under which A. was holding.  Meanwhile, A., W., and D. co-operated to acquire a release of the state's claim, and, as a result of their joint efforts, the state, by an act of the legislature passed in 1887, released its interest to A. for the sum of $31,044, one-half

of which was paid by A. and one-half by W. In 1890, A.'s interest in the property was sold upon a judgment recovered against him in 1885 by H., and was purchased by P. in the interest of H., and one G. succeeded to the title, and held it in the interest of H. Foreclosures of the mortgage were begun in 1886 and in 1894, and were defended by A., and, after his death, by his heirs, and also by G., and cross bills were filed by such parties to annul the mortgage. The mortgage was alleged to be void (1) upon the ground that W. had and had conveyed no title to A., and A. had purchased the paramount title from the state by virtue of the release; (2) on the ground that at the time of the sale to A., in 1879, the vendor's attorney, one F., had represented fraudulently to the vendee's attorney, who was examining the title, that the land was occupied by R. until his death, and that his house was built on it. It was held by the court: (1) That the alleged representation that R. lived upon the property was not made by W.'s attorney, but that he stated that R. lived upon the portion of lot No. 1 easterly of the land sold to the state, and was in possession of the land in question. (2) That A. was not evicted in fact or constructively by paramount title, but that he received a release of the state's title pursuant to the joint efforts, and at the joint expense, of A. and W., and pursuant to an agreement between A. and W. that the state's interest should be released to A., and that such release was not taken by A. in his sole interest, and against the interest of his grantor, W., for the purpose of extinguishing the title theretofore held by A., but rather to protect the existing interests of the holder of the mortgage, as well as those of the grantee, and to perfect the title already granted to A. (3) That the alleged fraudulent representations as to possession were merged in the covenants of warranty and quiet enjoyment contained in the deed from W. to A.; that in 1880 A. learned that the representations alleged to have been made that R.'s house was on the land in question were not true, and that in 1881 he was privy to the foreclosure of the mortgage given in 1879, and caused the premises to be repurchased in his interest on such foreclosure, and thereupon paid $20,000 in money and gave the mortgage in question, and that he did not seek to annul the mortgage for the alleged fraud until 1886, when foreclosure thereof was begun. (4) That the judgment creditors of A. acquiring liens in 1885 and 1886, and the purchaser under the sale upon H.'s judgment in 1890, were estopped to assert the fraud by the repurchase by A. after knowledge of facts showing that the misrepresentation, if made, was untrue, and by A.'s delay in seeking relief from the mortgage. (5) That such judgment creditors and purchasers, on the sale of the land on the judgment in 1890, could not assert a breach of the covenants in the deed from W. to A., and were bound by the arrangement made by A. with W. and D. for securing the state's claim in the interest of the existing arrangement. (6) That the right of the state to assert its claim had not been lost by its failure to bring action for recovery of the possession of the property under the statute of limitations prescribed by section 362 of the New York Code of Civil Procedure.

These were suits in equity for the foreclosure of a purchase-money mortgage, which were consolidated, and in which cross bills were filed for the cancellation of such mortgage.

John E. Parsons and Edward S. Clinch, for Alonzo B. Wright and Aaron A. Degrauw.

Hatch & Wickes, for Chittenden, assignee.

Benj. F. Tracy and Maxwell Evarts, for Isaac E. Gates, Henry Y. Attrill, Helen F. Attrill, and others.

THOMAS, District Judge. In 1809, William Cornwell, being seised thereof, conveyed to Nathaniel Ryder a strip of land containing about 200 acres, and comprising at that time the westerly end of Rockaway Beach, the westerly boundary being the inlet or gut. Since that date,

by the action of the water, several hundred acres have been added to the westerly end of the strip. Such deed was not recorded, and seems to have been forgotten, or neglected, until it was found by Judge Morris Fosdick, in his office, and recorded in 1879, under the circumstances hereinafter stated. In 1814, Ryder conveyed to the state of New York the westerly portion of the 200 acres, which, with the additions above mentioned, contain the land in controversy. The deed to the state appears to have been recorded in the office of the secretary of state in 1835, out of its chronological order, but there is no evidence that any of the parties to the present controversy, or any of their agents, had knowledge of such deed or record, until the year 1884, when the state of New York asserted a claim to the land. In 1830 proceedings were taken under the statute to foreclose a mortgage given by Ryder to Cornwell for a portion of the purchase money of the 200 acres conveyed to Ryder by Cornwell, which resulted, on 7th May, 1831, in a sale of such portion thereof as lay east of the land so conveyed to the state, to Rothery Ryder, son of Nathaniel Ryder, and Henry Hewlett. There is no evidence that the state of New York ever took possession of the land conveyed to it, but the United States, by the acquiescence or permission of the state, took control thereof, or a portion thereof, and erected a blockhouse thereon for the purposes of the war of 1812. Such control thereafter ceased, and the blockhouse, falling into disuse, finally disappeared so completely that its precise location is not ascertainable. But the land conveyed to the state was, in a general way, spoken of in that community, and described in surveys, as lands of the government or of the United States. Nathaniel Ryder, although deprived in 1831 of the title to the eastern portion of the land purchased by him, lived in the house thereon, as he had lived theretofore, near to the time of his death, in 1832, which is hereafter considered. In Ryder's deed to the state he reserved the right "at all times to take and carry away, for his own use, the drift sedge" thereon; and he did, intermediate his conveyance to the state and his death, use the land for pasturing his cows and sheep, as such land lay open and undivided by inclosure from his remaining property, and other persons at times used it for grazing purposes. It is doubtful to what extent Nathaniel Ryder claimed an interest in the land conveyed to the state after such conveyance, but there is evidence that he frequently spoke of having sold to the government. After Ryder's death, in 1832, the land in question (the land conveyed to the state) continued until the times hereinafter mentioned, as it had after its disuse by the United States, to lie uninclosed and exposed, a long stretch of sandy waste, useless for agriculture, and unsought for the purpose of residence. There is no parol evidence that Ryder's heirs used it or exercised any rights over it, or claimed to have any interest in it, nor is there any evidence that Ryder's heirs, after his death, continued to live in the house on the eastern portion. But the fact of such possession of the land in question is evidenced (1) by the Durland partition proceedings; (2) by the judgment in Littlejohn v. Attrill and others, to which attention is hereafter called.

On the 19th of March, 1872, the secretaries of the treasury and of war of the United States united in a lease to Aaron A. Degrauw,

whereby, in consideration of an annual payment of one dollar per year, Degrauw was permitted to occupy such land until requested by either secretary to relinquish the whole or any part thereof.    Somewhat previous to this, Degrauw had erected a hut on the property, and after the lease exercised some dominion over the land.    Although Degrauw had obtained a lease from the United States, yet there were no evidences of a record title in the United States, and Degrauw was advised by Mr. Clinch, his counsel, that the title of the land was apparently in the heirs of Nathaniel Ryder, and thereupon one Durland was engaged to obtain releases to himself from such heirs, and the latter did thereafter obtain conveyances from such heirs of $587/840$ of said premises, and thereupon, in 1873, brought an action of partition against such of Ryder's heirs or their successors as appeared to hold the remaining interest.    In 1874 it was referred to Edgar A. Hutchins, who was shortly before a law partner of, and at the time had his office with, Mr. Clinch, who was also Durland's attorney, and such referee reported, upon evidence adduced before him, which evidence has not been discovered for the purposes of this action, that "Nathaniel Ryder, Sr., died intestate April 12, 1832, seised and possessed" of the land in question; and "that he had held adverse possession of said real estate, and has claimed to be the owner thereof and exercised rights of ownership therein, from a period preceding the year 1802 to the time of his death, and that at the time of his death he was living on said property." The referee took the evidence of Ruloff Van Clief and wife, Jesse Craft, and Richard Ryder and Smith Ryder, respectively, son and grandson of Nathaniel Ryder, and Judge Morris Fosdick, all of whom were old residents of that section and acquainted with the property.    The particular facts stated by these witnesses severally are not shown, but presumptively the referee, from one or all of them, obtained the information embodied in the report.    The partition action was conducted with due observance of legal requirements, and all matters known to be of record were laid before the referee.

It is suitable now to consider what facts apparently were known which could be communicated to the referee.    In the first place, the conveyance in 1814 by Nathaniel Ryder to the state of New York was unknown to the parties, and the deed to Nathaniel Ryder by Cornwell was not present, and there is no evidence that its existence was within the knowledge of the parties or any of them.    Judge Fosdick produced it some years later, on the sale in 1879 from Wright to Smith, and then stated to Mr. Hall, the lawyer examining the title for the proposed purchaser, that "he had found that deed, and that he supposed he had mislaid it or it had been lying about, and he had neglected to record it."    Nevertheless, the former ownership of Nathaniel Ryder was known, at least his title was inferable, both from the former occupation of all of lot No. 1 and from the mortgage given to Cornwell for the purchase money.    It was undisputed that Nathaniel Ryder lived until 1831 on the eastern part of lot No. 1, and, while it might be presumed that he was deprived of that portion as a result of the foreclosure action in 1831, there was no evidence of record that Ryder had alienated the western portion of lot No. 1 (the land in question), which at one time he had owned and occupied to the degree that such

land was useful for occupation, which land formed an uninterrupted continuation of the portion of lot No. 1. It is apparently an incorrect finding that Ryder lived on the immediate premises up to about the time of his death. His grandson states that he died in his former home; but there is other evidence that in fact he died in the house of his son, who lived on lot No. 2, east of lot No. 1. But, if he died in his former home, that was not on this portion of lot No. 1, if the same be considered independently of the eastern portion. Moreover, it is probably an incorrect conclusion that Ryder held adverse possession of said real estate, and claimed to be the owner thereof, and exercised rights of ownership therein, for a period preceding the year 1802 to the time of his death. Even if this be untrue, in the light of the present knowledge of the history of the property, it is not necessarily an evidence of fraud that testimony of this nature should have been given to the referee, and that he should have found accordingly. The reference to the date of 1802 probably arose from the fact·that some of the land involved in the Cornwell partition proceedings (see commissioners' report) was theretofore owned by Ryder, and upon this it is inferable that the claim and finding was based that Nathaniel Ryder's interest in lot No. 1 antedated that action. Whether Ryder had adverse possession was a conclusion for the referee, founded upon the facts presented. For instance, he found that Ryder claimed to own it. As it appeared that he was at one time in possession of all of lot No. 1; that his possession was not interrupted, save as the United States used some portion for a blockhouse; that he executed a mortgage upon it; that he used it for pasture,—it is not a proof of fraud that the referee found that he (Ryder) claimed to own it, and that he held it adversely. The fact must have appeared that Nathaniel Ryder, at some time subsequent to 1809, had occupied and claimed to own the premises in connection with the other part of lot No. 1; and yet it was not clear, by record evidence, where he obtained it, or what he had done with the western portion, and so the doctrine of adverse possession was resorted to for the purpose of sustaining his title. But it does not appear that Judge Fosdick is responsible for any of the conclusions of the referee, and, even if it were otherwise, his statements under oath to the referee are not available to the purchaser from Wright upon a conveyance some years subsequent in time; and the matter is chiefly important as bearing upon certain false statements alleged to have been made by Fosdick at a later period.

It should be observed, in passing, that there was nothing reprehensible either in the motives that prompted the initiation of the partition proceedings or the procedure therein. An examination of the record discloses nice care in collecting whatever was to be learned from the records, and also extrinsic facts, and each step in the action was taken with precision. There was a large tract of land with which Degrauw was acquainted, and which he desired to obtain, and the owner's title was in doubt. He first obtained a lease of it from the United States, in whom, since 1812, both upon surveys and in the estimation of the inhabitants, there were some rights of property. Yet diligent search showed no evidences of property interest in the United States, save as the recollections of the blockhouse and of the occupancy

for the purposes of the war of 1812 manifested the same. The relation of Nathaniel Ryder to the property suggested a probable interest in him, and after his death in his heirs, and Degrauw was quite justified, either in his sole behalf or in his association with Mr. Clinch and others, in obtaining whatever interest existed perchance in the Ryder family. The property was offered for sale in the usual way. In the uncertainty of the title, and perhaps because he was a lessee of the United States, Degrauw preferred to keep distinct whatever rights he had acquired from the United States, and therefore the purchase at the partition sale was made by Alonzo B. Wright, and conveyance was made to him by the referee. It is urged that Degrauw is blameworthy because he is said to have announced at the sale (which he denies) that he had and claimed rights in the land under a lease from the United States. This does not necessarily follow. As the owner of the lease, and in view of the possible interest of the United States, to which he had in a measure succeeded, Degrauw had a right, acting in good faith, to protect whatever of title he held, and the evidence is not convincing that he acted dishonorably. In any case, it was not a wrong that of itself accrued to the injury of any legal right of subsequent purchasers.

Following the history of the property from the time of this sale in the partition action, it appears that Wright continued to hold whatever he acquired in 1874 under the conveyance to him, asserting such right by ejecting by action persons in actual possession, and that Degrauw continued to claim under the lease from the United States acquired in 1872, until the year 1879, when the sale of the property was made out of which the present controversy arose. Although Wright had purchased as above stated, he took no part in negotiating the sale to which attention is now to be called, but the same was conducted on the part of Wright by Degrauw, who held a power of attorney from Wright, pursuant to which he contracted, June 12, 1879, to sell the property to Henry Y. Attrill. Thereby Degrauw recognized the title of Wright in the property. Although Attrill was in fact the purchaser, yet, to avoid certain personal responsibilities, Attrill procured Benjamin E. Smith to take the title, and Smith accordingly accepted the deed of the premises, dated August 15, 1879, from Alonzo B. Wright. This deed contained a covenant of an indefeasible estate of inheritance in fee simple; also a covenant of good right to convey; also a covenant of quiet enjoyment; also a covenant against incumbrances; also a covenant of further assurance; also the usual covenant of warranty. Before the delivery of the deed, it appeared that a lis pendens had been filed against the premises in an action brought by Mr. Clinch against Degrauw, and the purchaser objected to completing the arrangement on that account. To meet this objection, Degrauw executed an instrument under the date of August 15, 1879, reciting the contemplated deed from Wright to Smith, whereby Degrauw guarantied the fulfillment of the covenants contained in such deed; "provided, however, in case any such claim or liability shall be asserted against said Wright or his heirs or assigns, or against the property so conveyed by him, then prompt and reasonable notice shall be given to me, the said Aaron A. Degrauw, my heirs, executors, or adminis-

90 F.—36

trators, of such asserted claim, and I or they be permitted to defend against the same." Pursuant to such deed and contract of guaranty, the premises were delivered to said Smith, and he took possession thereof through himself, or through Attrill, to whom Smith conveyed the premises, with full covenants of warranty, on the 25th day of August, 1879, and the said Attrill thereafter remained in possession of said premises pursuant to said conveyance. The purchase price of the premises, under the contract between Wright and Attrill, and the deed from Wright to Smith, was $200,000, of which $30,000 was paid, by or on account of Attrill, to Degrauw or somebody in his behalf, and the remaining sum of $170,000 was secured by a mortgage on the property executed by Smith to Wright. In 1881, default in the payment of interest having been made on such mortgage, and perhaps for the purpose of eliminating some alleged interest of Smith, a foreclosure was had, pursuant to which the premises were sold to one Billings for $185,000, who assigned the bid to one Phipps, agent and clerk of Attrill, who on or about July 11, 1881, received a deed from the referee. Phipps executed a bond and mortgage on the property for $150,000 to Wright, and paid $20,000 in cash from moneys belonging to Attrill, in whose behalf all the purchases were made, and such moneys ultimately passed to the account of Degrauw. Phipps conveyed the premises to Billings, by deed dated July 11, 1881; Billings, October 3, 1881, conveyed to Moore; Moore conveyed, on 11th September, 1882, to Gerau; and Gerau, on the same date, conveyed to Attrill. The original covenants ran to the purchaser under the mortgage. Mygatt v. Coe, 142 N. Y. 78, 89, 36 N. E. 870; Peters v. Bowman, 98 U. S. 56, 59; Thomas v. Bland (Ky.) 14 S. W. 955. Attrill was meantime in possession, and so continued holding and claiming to hold under no other title than that apparently derived from Wright. In 1881, by chapter 610, the legislature of the state of New York passed an act directed to the investigation and protection of the rights of the state in property acquired during the war of 1812, but no specific reference to the property in question was had. In 1884 a clause was inserted in the supply bill appropriating money to carry out the act of 1881, and pursuant thereto a survey of the Rockaway Point lands was made in February, 1885, at the instance of the state; and in March, 1885, the state brought an action of ejectment against Attrill and Smith, to recover the possession of the lands, notice of the claim of the state having been served on Attrill on January 26, 1885. Attrill first learned of the claim of the state on or about August, 1884. From May 7, 1884, letters were sent by Attrill or his agent, Phipps, to Degrauw, showing co-operation in protecting and promoting the interests of the property in question. In December, 1884, Degrauw and Attrill, both then aware of the claim of the state, met at the office of Mr. Parsons, their attorney, and discussed such claim, and conversation was had to the effect that the claim of the state should be contested, if possible, and, in case it was advisable to settle such claim, that each party should pay one-half the cost thereof; and it was concluded that Mr. Parsons, who was in communication with the state officials, should undertake the arrangement of the matter by the passage of a bill through the legislature; and Mr. Parsons did there-

after, acting for these parties, undertake and continue his efforts to secure a settlement of such claim of the state, until, in 1887, that result was attained. On January 22, 1885, a bill having been drawn, by Mr. Parsons, for presentation to the legislature, Degrauw wrote Attrill that "Mr. Wright will pay one-half of the expenses that has to be paid to the state for the passage of bill, which then will give you a perfect title (if the state claim is a claim), and I will become personally responsible as security for Wright for its payment." Under date of 28th of March, 1885, and while the bill was pending in the legislature, Attrill wrote to Degrauw: "In consequence of the ejectment suit brought by the state of New York against me concerning my Rockaway lands, and your relation to me as guarantor of my title to the property, it is necessary that there should be an immediate understanding between us with reference to the defense of the suit, as I have to make answer in the next few days." Following this is a statement of an intended absence, and then the following: "This is to say that I have authorized Mr. Coles Morris, of 170 Broadway, who is acting for me, in connection with Mr. Jno. E. Parsons, to see you on this subject. I have instructed him fully as to my views in relation to this business." Attrill, Degrauw, Morris, Fosdick, and Parsons continued to have communication and meetings on the subject during the year 1885, although the bill was, during the session of 1885, defeated in the legislature. After the opening of the year 1886, such communications continued, and the aid of Degrauw was sought and obtained by Morris to defeat actions brought by Hatch and Huntington, about claims of certain personal liability against Attrill, concerning the sale of the premises on judgments recovered therein, concerning the trial of the action of the state, and the suggested foreclosure of the mortgage given by Attrill to Wright, and the purchase of the premises on the sale thereof by Degrauw in the interest of Attrill. Thus the matter was brought down to the year 1887.

Before considering the events of that year, leading up to a release of the rights of the state to Attrill, a reference to the litigation that had arisen is necessary. Under the date of January 13, 1885, Attrill sent to Fosdick, Degrauw's attorney, the following letter:

"If the title is good, it is all right. If the title is bad, I do not suppose that I am liable for the mortgage, either principal or interest. I send a check, but perhaps it is better for me in doing so to say that it is not to be considered as a waiver of any of my rights. Between now and the time that interest becomes due, I hope that the title question will be settled. With the state claim against the property, I cannot use it. If within the six months all questions are not disposed of, I shall then wish, instead of paying the interest, either to let it stand or make it a special deposit."

Before the next payment of interest became due, and on the 19th day of February, 1885, the state had begun the action of ejectment, and under the date of 6th June, 1885, Attrill wrote Fosdick the following letter:

"I went to Jamaica to see you and Mr. Degrauw relative to the Rockaway land matter, and regretted not to find you in town. My business was relative to the coming interest on the mortgage. I desire to have the payment postponed at its due date, or held over until the state ejectment suit is decided one way or the other; for, if the suit is decided against me, the mortgage is worth nothing, and I should have recourse against Mr. Degrauw. I trust you will

come into my views as to the necessity for withholding of the interest on my part, even in the face of the terms of the mortgage."

—To which Fosdick answered as follows:

"Yours of the 6th inst. rec'd, and contents noted. I have had consultation with the holder of the mortgage. He is not willing to make the arrangement you suggest, on the ground that it might be construed as implying a doubt on his part of the goodness of his mortgage, and he did not intend, if he could avoid it, of being placed in such a position."

But Attrill did in the August following make the payment falling due July 11, 1885, which was the last payment made upon the mortgage. On 21st December, 1885, Hatch and Fisk obtained a judgment against Attrill for $163,690.31, and on June 13, 1886, Huntington obtained a judgment against Attrill, and both judgments became liens on the premises. On the 25th day of April, 1890, the premises were sold on execution issued on the Hatch judgment, and on the 30th day of July, 1891, one Parkin became the owner of whatever interest was acquired on such sale by virtue of the sheriff's deed, and this interest was subsequently granted to Gates. On August 2, 1886, Wright began in the supreme court of New York the foreclosure of the mortgage given him by Smith for a portion of the purchase money, and Attrill, by answer verified on November 13, 1886, answered in such action, as did Hatch and Fisk, which action was removed to this court on the 19th of November, 1886. On the 25th of January, 1887, Attrill filed a cross bill, amended December 5, 1887, to which Wright answered. Evidence was taken on the cross bill filed by Attrill, from February 16, 1888, to December 4, 1891, and by the defendants in the cross bill from October 10, 1888, to June 19, 1890. On the 20th of January, 1892, Attrill died, and a bill of revivor was filed by William A. Fisher, the assignee of Attrill's administrator, on the 31st of May, 1892. In July, 1894, Aaron A. Degrauw commenced a suit for the foreclosure of the same mortgage, against Helen F. Attrill, Elizabeth C. Attrill, Horace H. Chittenden, as assignee, C. P. Huntington, and Isaac E. Gates, setting up an assignment of the bond and mortgage made by Alonzo B. Wright to the plaintiff Aaron A. Degrauw, dated June 13, 1894. Helen F. Attrill and Elizabeth C. Attrill answered, and on October 9, 1894, they filed a cross bill setting up fraud, no title in Wright, and purchase by Henry Y. Attrill of title of state. The defendant Gates served his answer, and simultaneously, on the 9th of August, 1894, removed the cause into the United States circuit court for the Eastern district of New York. Thereupon, Gates filed a plea in this last action, setting up a former action pending between the same parties. Testimony was taken upon such plea; and the issues raised by the plea and replication thereto were brought to a hearing before Judge Wheeler, who on the 29th of June, 1896, overruled the plea and directed the defendant Gates to answer. Thereupon, on the 2d of October, 1896, the defendant Gates answered, and simultaneously with said answer filed a cross bill to the original complaint, alleging fraud in the manufacture of a paper title, which was transferred to Attrill, and setting up want of title in Alonzo B. Wright, and the conveyance by the state to Attrill. Degrauw filed an answer to the cross bill. On the 26th of February, 1897, an order was made consolidating all these actions: Wright v. Attrill, Degrauw v. Attrill,

Fisher v. Wright, Attrill v. Degrauw, Gates v. Degrauw; and directing that they be heard as one. In September, 1897, a small amount of testimony was taken,—that of the witness Edward S. Clinch.

The answer of Attrill in the Wright foreclosure action averred, among other things, that:

"Attrill held under the contract with Wright; that Wright never had any interest in, or right to, or possession of, the said mortgaged premises, his alleged title thereto being nothing but a paper title, which was a false and fictitious fabrication, conceived and gotten up for the sole purpose of enabling the plaintiff to perpetrate a fraud upon purchasers of said premises from him; and that the defendant was so defrauded, and purchased said premises from the plaintiff, relying upon the validity of such paper title, which was expressly alleged by or on behalf of the plaintiff to be a truthful statement of the plaintiff's title to said premises, and upon representations made by or on behalf of the plaintiff to said defendant, or to his attorney, who was employed by said defendant to examine said title, that one Nathaniel Ryder, through whom and his heirs the plaintiff claimed title to said premises, had held adverse possession of the same, and exercised rights of ownership therein, from the year 1802 to the time of his death, in 1832, and was living thereon at the time of his death; which allegations and representations, as said defendant has since been informed and believes, were false, and were known to the plaintiff to be false when they were made."

The answer of Hatch and the answer of Huntington each avers that the defendant's interest in and lien upon said premises, by reason of the judgment above described, is not in any wise subject or subordinate to any lien of the alleged mortgage referred to in the complaint, and that, if any such mortgage was ever executed, the same did not represent any actual indebtedness, or obligation of any security for any actual indebtedness or obligation, and was given without consideration, and was wholly void.

Notwithstanding the allegations in the several answers and bills filed by Attrill, he appeared in the action of ejectment brought by the state, and denied that the plaintiffs "are, or that at any of the times in that behalf in the complaint alleged they were, owners in fee simple, absolute or otherwise, or entitled to the immediate possession, or to the possession at all, of the said described lands, or of any part thereof"; and denied that the said lands "are, or that at any of the said dates they were, or that for a long time prior thereto or at all they had been, unoccupied"; but rather Attrill alleged "that at the dates in the complaint stated, at the time of the commencement of this action, and for more than forty years prior thereto, he, and those through whom his title is derived, all of whose rights in the premises have become duly transferred and conveyed to him, are and were the true and only owners of the said lands, and seised of the same by a good title in fee simple absolute, and that at all such times he and they were in the possession and occupation of the said premises, exercising acts of ownership over the same, and claiming title thereto, and to be the sole, only, and absolute owners thereof, by a title in fee adverse to any claim of ownership in the plaintiffs."

In no action have any of the parties now claiming the premises in hostility to Wright or Degrauw alleged either eviction, actual or constructive, or surrender to a paramount title. In all pleadings by Attrill during his life he alleged that he was holding under the contract of

sale made by Wright and himself, subject to the mortgage given to Wright, or under the conveyance by Phipps to himself.   He also alleges that Wright had no title, and that the sale was procured by means of fraudulent representations; but no superior title is ascribed to the state, or to any specified person, nor is there any allegation of fraud showing eviction, actual or constructive.   There was therefore no occasion for Wright to answer with averment that the state's interest was procured pursuant to an agreement between Attrill, Wright, and Degrauw to extinguish the same.   In no instance have Hatch, Huntington, Gates, or the administrator or widow or heirs of Attrill alleged either eviction, ouster, or surrender to a paramount title, but Gates and Helen F. Attrill, the widow, and Elizabeth C. Attrill, the daughter, of Attrill, have alleged that Attrill, in his lifetime, procured the title of the state, and held under the same to the time of his death; to which answer was made that the title of the state was relinquished to Attrill by the joint action, and at the suit and expense, of Wright, Attrill, and Degrauw.

But how did Attrill obtain the state's title?   After the opening of the year 1887, Mr. Degrauw, Mr. Clinch, his attorney, and Mr. Morris, the attorney for Mr. Attrill, acting in conjunction with Mr. Parsons, again undertook the settlement of the claim of the state, and held communication, by letter and in person, relating thereto.   An act was prepared and considered by all these persons, and introduced into the legislature.   Before its passage the following stipulation was made and delivered to Mr. Morris, at his solicitation:

"Supreme Court, Queens County.

"The People of the State of New York against Henry F. Attrill and Eugene Smith.

"Whereas, a bill has been introduced into the legislature of the state of New York, which is intended to release to Henry Y. Attrill and his assigns all the interest the state may have in the premises described in the complaint in this action, on which lands I hold a mortgage:  Now, therefore, I agree to pay one-half of the amount that it may be necessary to pay to secure such release, by the terms of the act that may be passed by said legislature, provided the total amount to be paid shall not exceed the sum of twenty-five thousand dollars.

"Dated March 12, 1887.                              Alonzo B. Wright.

"In consideration of the sum of one dollar, I hereby guaranty the performance by Alonzo B. Wright of the preceding agreement.

"Dated March 12, 1887.                              Aaron A. Degrauw."

As the result of the efforts and acts of such persons, chapter 560 of the Laws of 1887 was passed, releasing the land in question to Attrill, upon the payment by him, within 60 days after the passage of this act, to the comptroller of the state, of the sum of $20,000.   This sum of money, together with $11,044, making $31,044 in all, was paid, one-half by Attrill and one-half by Degrauw.   The payment by Degrauw was pursuant to the stipulation hereinbefore set forth.   Although Attrill denies knowledge of the written stipulation by which Wright and Degrauw bound themselves to the payment of the sum aforesaid, yet it fully appears that Attrill authorized the arrangement, and, indeed, it appears that he had made a similar arrangement in person.   Beyond controversy, Attrill knew of Degrauw's co-operation in procuring the release, and of his agreement to contribute to obtaining the same.

It thus appears that Attrill secured the state's claim by buying it at a small price, in part with Wright's or Degrauw's money, after some years' disclaimer of such title by himself and Degrauw, and pursuant to negotiations between Degrauw and himself to so purchase it, culminating in a stipulation to that effect drawn by his authorized agent in the ejectment action. The object of all this was not to vest in Attrill a paramount title that should extinguish Wright's mortgage, but to acquire the state's claim in the interest of Degrauw, Wright, and Wright's grantee, Attrill, the person to whom Wright and Degrauw had assured the title. The intention of the parties, and the object they had in view, is indubitably revealed by their intercourse, their correspondence, their conversation, their agreements, and their payments. With these facts in view, the question of eviction may be considered.

Covenants of seisin and of good right to convey do not run with the land, and are broken, if at all, by the delivery of the deed,—in the present case by such delivery to Smith. Mygatt v. Coe, 124 N. Y. 212, 26 N. E. 611; Marston v. Hobbs, 2 Mass. 439; Greenby v. Wilcocks, 2 Johns. 1; Hamilton v. Wilson, 4 Johns. 72; Abbott v. Allen, 14 Johns. 248; Peters v. Bowman, 98 U. S. 56; Leroy v. Beard, 8 How. 451; Pollard v. Dwight, 4 Cranch, 421. The cause of action arising upon such breach passes only by assignment to a subsequent grantee (Mygatt v. Coe, 124 N. Y. 212, 26 N. E. 611; 3 Washb. Real Prop. 479); but covenants of warranty and of quiet enjoyment, which are to be regarded as synonymous (3 Washb. Real Prop. 499; Rea v. Minkler, 5 Lans. 196, 199), are future in their operation (3 Washb. Real Prop. 498), and the action for the breach should be brought by him who is the owner of the land, and, as such, the assignee of the covenant at the time it is broken (3 Washb. Real Prop. 503). If the covenant was broken before sale to a subsequent grantee, it may be sued on by such subsequent grantee in the name of the holder. Peters v. Bowman, 98 U. S. 56, 59. Even a release from the covenant itself can be made, and only made, by the one who holds the title of the estate, and such discharge affects only such subsequent bona fide purchasers as have notice of the same when purchasing the estate. 3 Washb. Real Prop. 505. In the present case, although the Hatch and Huntington judgments became liens on the property severally in 1885 and 1886, the estate did not pass out of Attrill on a sale thereunder previous to 1890, and prior to that time Attrill, and Attrill alone, had power to enforce or to discharge any breach of the covenants of warranty and of quiet enjoyment. There were several courses open to Attrill upon the assertion of the claim of the state to the land. He could defend, with or without notice to his grantor to protect his covenant. He could surrender the premises, or await an eviction. If he defended without notice to his grantor, or surrendered the premises, or awaited eviction without notice to his grantor, he assumed the burden of showing that the outstanding title was paramount. McGrew v. Harmon, 164 Pa. St. 115, 30 Atl. 265, 268; Ogden v. Ball, 40 Minn. 94, 41 N. W. 453; Hodges v. Latham, 98 N. C. 239, 3 S. E. 495; Succession of Cassidy, 40 La. Ann. 827, 5 South. 292; Shattuck v. Lamb, 65 N. Y. 500. In the present action there is not even a pretense of eviction. In all the pleadings filed by

Attrill there is no assertion of eviction, constructive or actual, by one holding paramount title, or of surrender of premises in view of such paramount title. But, on the other hand, from the very moment that the state asserted title to the premises, Attrill defied, and used every effort that the machinery of the law would permit to defeat, the title of the state, and consistently therewith denied in his answer such title, and asserted good and valid title in himself and in his grantor. Moreover, although he did in the action of foreclosure aver the fraud as a defense, and deny the title of Wright and Degrauw, yet inconsistently therewith he undertook, in co-operation with Degrauw, to defeat the title of the state, and, through himself and his agent and attorney, entered into a stipulation that Degrauw and Wright should furnish one-half of the money to obtain the release of the state's claim. By letter, by personal interview, by conjoined endeavor in defending the state's action, in appealing to the legislature, and in effecting the passage of the bill through the legislature, Attrill showed his willingness and agreement to work in conjunction with Degrauw to acquire the claim of the state and to permit existing relations to remain undisturbed. It is very well known that the state, in releasing claims, prefers those who have the apparent title, and the release was made to Attrill in this case because he was holding possession under the title alleged to be conveyed to him by Wright, and because he asserted to the state that he was in possession, holding such title and claiming it to be valid. The very right, and the only right, that he had in the property, and the only claim he had upon the state to relinquish its interest to him, for the small sum paid, was this pretended equity, which he founded upon the very title which, having obtained the release, he now seeks to dispute. Therefore the insistence by Attrill's heirs and successors that this release constituted an independent purchase of the title, in hostility to the existing deed given by Wright, cannot be supported. It is true that, in addition to the courses above stated to be open to Attrill, another course has been considered available to the grantee, viz. to purchase the paramount title when it is so asserted that he must submit to it or to ouster. The decisions relating to this alternative involve two distinct classes of facts: Those where the grantee was in possession and judicial sale was made of the land, at which the grantee, or some one in his behalf, purchased to save his possession. Such were Cowdrey v. Coit, 44 N. Y. 382; Tucker v. Cooney, 34 Hun, 227; and see Hunt v. Amidon, 4 Hill, 345; and such may be accepted as the law, notwithstanding the holding in Waldron v. McCarty, 3 Johns. 471. But in the case at bar the claim is that Attrill, by a similar compulsion, and constrained so to do by the action of ejectment brought by the state, purchased the state's title. In New York this has never been held tantamount to eviction, and there is decision tending to a contrary conclusion. Boreel v. Lawton, 90 N. Y. 293, 297; Edgerton v. Page, 20 N. Y. 281; Mead v. Stackpole, 40 Hun, 473, 476. But in other states there is decision favoring the right of the grantee to purchase at private sale and hold under paramount title. Perhaps the view is most forcibly presented in McGary v. Hastings, 39 Cal. 360, 366; and support for the doctrine may be found in other cases, which need not be reviewed at this time.

If the doctrine stated be supported by them, still the rule must be that the purchase must appear to have been made in the interest of the grantee, and against the interest of the grantor, for the purpose of extinguishing the title theretofore held by the grantee, and for the purpose of asserting the new title thus acquired against the previous grantor. If, on the other hand, it appear that grantee and grantor have defended against the claim of a third person to the land; that they have, through several years, co-operated to settle it; that they have agreed to share in the expense thereof, and do so share; and pursuant thereto a release of the outstanding title is made to the grantee upon the payment by the grantee and grantor of a sum which bears a slight relation to the value of the land,—it must be concluded that the release was obtained and taken by amicable arrangement, for the purpose of protecting the existing interests of the grantor as well as those of the grantee. It has been held that a grantee must act in good faith towards his covenantor, and make the most of whatever title has been acquired until resistance to the paramount title ceases to be a duty to himself or his covenantor. Moore v. Vail, 17 Ill. 190. See Hagler v. Simpson, 44 N. C. 386. However this may be, it is a defensible doctrine that when the grantor and grantee unite for a certain end, viz. the settlement of an outstanding claim, and devote several years of joint action to this common purpose, a court of equity should not permit the grantee thereupon to declare that because, under the arrangement, the release was made to him, he was thereby entitled to recover the original purchase price from the covenantor. In the case at bar, the mortgage represents simply a portion of the purchase price, and Attrill would have no greater right to relief against the mortgage than he would have to recover the amount thereof if it had been previously paid. It is a general rule that the grantee cannot resist payment of mortgage upon land purchased by him upon the ground of invalidity of title in the grantor, and at the same time retain possession. Gifford v. Society, 104 N. Y. 139, 10 N. E. 39. Attrill not only retained the possession, but he did so in vigorous protest against the asserted paramount title, and he confirmed that possession by the aid of the holder of the mortgage, whose interest he now seeks to defeat.

With these facts stated, it becomes necessary to consider the question of fraud, and therefore to go back to the time when the examination of the title was made by Hall, an attorney for Attrill. At the time the contract between Degrauw and Attrill was perfected, and after the terms thereof had been determined, Hall, a lawyer, was called in by Attrill, and made an examination of the title. Mr. Morris Fosdick, who was an agent or attorney for Degrauw, was present, and offered to give Hall information concerning the property, and, according to the evidence of Hall, produced a deed from Cornwell to Nathaniel Ryder, as above mentioned, and also stated that there was a blockhouse on the point west of the United States line, and that Mr. Nathaniel Ryder, at that time dead, had, during his lifetime, resided, generally speaking, on the furthest part of the inlet or point then occupied by any one as a residence,—furthest point down towards the end of the property where anybody lived; "and I think he told me it was on a point beyond the blockhouse,—west of the blockhouse; I should say

some little distance down.    I got the idea from him, and I got the information from him." And the witness, refreshing his memory from an abstract of title made at the time, said:    "I see that I have stated in the abstract of title that I made of this property that five thousand feet, or about five thousand feet, running west of the United States line, was occupied by Nathaniel Ryder until his death, his dwelling house being built on it.    That information I have no doubt I believed to be correct at the time I obtained it from Mr. Fosdick."    Fosdick, upon his examination herein, stated that he knew where Nathaniel Ryder's house was, and had frequently seen it, and that it was situated about one mile to the east of what was called the "United States Line"; that he did not state to Mr. Hall that the house was west of the blockhouse.    It is urged that Fosdick probably made the statement as claimed by Hall, because Fosdick made an affidavit in the Littlejohn suit in which he stated as follows:

"And since I can remember the said property [referring to the land lately conveyed by Alonzo B. Wright to Benjamin E. Smith, and by Smith to Henry Y. Attrill] was occupied by the said Nathaniel Ryder, Sr., and in his possession, until his death, in 1832, and his children and their descendants continued to occupy and possess the said premises, or that part thereof west of the United States line, until about the year 1872."

The general sum of the charges against Fosdick is that he stated to Hall that Ryder's house was about one mile west of the United States line, and that Ryder had possession of the property in question.    It seems quite improbable that Fosdick located Ryder's house as stated by Hall.    Such a location would have apparently placed it in the sea, and an invention so clumsily fabricated was open to swift detection by aid of common knowledge of the living contemporaries of Ryder.    Hall undoubtedly intended to state the conversation correctly, but his evidence is not sufficiently superior in quality to that of Fosdick, himself a person much trusted, to make it acceptable as proof of a fraudulent statement.    Fosdick probably stated that Ryder's house was the last house on the point, and it is equally probable that Hall mistook the given direction from the United States line.    But it is urged that Fosdick stated that Ryder had occupation of the property in question until the time of his death.    If so, consider the circumstances under which such a statement was given.    Hall was a skilled lawyer, employed to trade the title of this property.    Fosdick was called in, and his knowledge of the property was placed at the disposal of Hall, to aid him in his search.    Fosdick produced and delivered to Hall the deed from Cornwell to Ryder, and that deed showed that Ryder apparently had the title and presumptive possession of the property from 1809.    Add to this the facts that the deed covered all of lot No. 1; that Ryder's house was on lot No. 1; that lot No. 1 was an undivided and uninterrupted stretch of sand, washed by water on three sides; that no alienation of the land in question was known; that Ryder pastured it, and used it as much as it was capable of use; that there was apparently no difference in the use of the land at any time from 1809 to Ryder's death,—should Fosdick be condemned for stating that Ryder had possession of the land in question during his lifetime?    Would any person knowing these facts have come to a different conclusion?    There is some

discrepancy as to whether Ryder died in his old home, and on the evidence now given the matter is in doubt, but it is not in doubt that Ryder did live on lot No. 1 to about the time of his death. Hall was quite aware that he was asking about events happening nearly 50 years before. He knew that he was seeking the history of spaces of drifting sand, and, down to a late period, of all but valueless land. He knew that the possession thereof would not be evidenced by artificial inclosures or actual cultivation, and that whether Ryder possessed it could only be concluded from his legal title to lot No. 1, subsequent grants of the same, and of evidences of such use as the land would permit. When, therefore, Fosdick stated that Ryder was in possession of the land, Hall must have understood that such was a conclusion or inference from all known facts. Possession under a claim of ownership could be only an inference, and in the opinion of the court, under the facts then known, was a perfectly justifiable, if not the only reasonable, inference. And it was by means of just such proof that Attrill obtained the judgment in the Littlejohn suit, to which attention will soon be called. This judgment, and Attrill's subsequent acts, as will be shown, convincingly dispose of the entire question of fraud.

It may be considered whether the representations were merged in the covenants. In Andrus v. Refining Co., 130 U. S. 643, 647, 9 Sup. Ct. 646, it is said:

"The covenant in the deed for quiet possession merged all previous representations as to the possession, and limited the liability growing out of them. Those representations were to a great extent, if not entirely, mere expressions of confidence in the company's title, and the right of possession which followed it against all intruders. The covenant was an affirmance of those statements in a form admitting of no misunderstanding. It was the ultimate assurance given upon which the plaintiff could rely,—a guaranty against disturbance by a superior title. That covenant has not been broken. * * * False and fraudulent representations upon the sale of real property may undoubtedly be ground for an action for damages, when the representations relate to some matter collateral to the title of the property and the right of possession which follows its acquisition, such as the location, quantity, quality, and the condition of the land, the privileges connected with it, or the rents and profits derived therefrom. Lysney v. Selby, 2 Ld. Raym. 1118; Dobell v. Stevens, 3 Barn. & C. 623; Monell v. Colden, 13 Johns. 395; Sandford v. Handy, 23 Wend. 260; Van Epps v. Harrison, 5 Hill, 63. Such representations by the vendor, as to his having title to the premises sold, may also be the ground of action where he is not in possession, and has neither color nor claim of title under any instrument purporting to convey the premises, or any judgment establishing his right to them. Thus, in Wardell v. Fosdick, 13 Johns. 325, an action for deceit was sustained against the vendor of land which had no actual existence, the court holding that in such case the purchaser might treat the deed as a nullity. The land not being in existence, there could be no possession, and, of course, no eviction, and consequently no remedy upon the covenants, and the purchaser would be remediless if he could not maintain the action. But where the vendor, holding in good faith under an instrument purporting to transfer the premises to him, or under a judicial determination of a claim to them in his favor, executes a conveyance to the purchaser, with a warranty of title and covenant for peaceable possession, his previous representations as to the validity of his title, or the right of possession which it gives, are regarded, however highly colored, as mere expressions of confidence in his title, and are merged in the warranty and covenant, which determine the extent of his liability."

This decision accords with the suggestion of Judge Marcy in Leonard v. Pitney, 5 Wend. 30, and with the dissenting opinion of Judge Bron-

son in Whitney v. Allaire, 1 N. Y. 313, but does not accord with the prevailing opinion in that case, which followed Culver v. Avery, 7 Wend. 380, and Ward v. Wiman, 17 Wend. 193, which are distinguishable from Monell v. Colden, 13 Johns. 396, 403. There are doubtless decisions in other states that uphold the holding of the rule as finally stated by the court of appeals of New York. Cooley, Torts (2d Ed.) p. 577. But whatever the holding elsewhere, or on different states of fact, the rule asserted in Andrus v. Refining Co., supra, is easily applicable to any untrue statements that may be found to have been made by Fosdick to Hall.

But the claim is that not only these representations were made, viz. (1) possession of Nathaniel Ryder and his heirs, (2) the location of Ryder's house west of the United States line, but that Attrill relied upon them, and the court is apparently asked to consider that Attrill for the first time learned that they were false upon assertion of its title by the state. In the suit instituted by Littlejohn, Attrill, Smith, Degrauw, Wright, and others were defendants. That suit involved the title of this very land, and the defendants obtained a judgment, which, among other things, provided:

"(4) From the time of the conveyance to the said Henry Y. Attrill he has claimed to own, and has been in possession of, the said premises, and he, and those through whom his title is derived, have at all times claimed to own, and be in possession of, the said premises, and they have had such possession thereof as the nature of the case admitted, the same consisting of unimproved land and upland beach, not cultivated or inclosed."

Then there is a finding of the actions of ejectment brought by Wright against William H. Newberry and Samuel Carman, and then follows: "They are the only persons who lived upon the premises prior to the conveyance to the defendant Attrill." This judgment was rendered October 1, 1880, at the instance of Attrill, upon proof presumptively supplied by Attrill and accepted by Attrill. In it he established a previous possession of those to whom he stood in privity of estate, including Nathaniel Ryder and his heirs, and in that he showed to the satisfaction of the court that no person before his purchase ever lived upon the premises. After such proof and judgment, he procured or was privy to the sale of the property by foreclosure, directed the purchase thereof by his agents, and the execution of the mortgage in question, paid or caused to be paid to Wright the sum of $20,000, and finally took title to himself. He then waited until the foreclosure of that mortgage was begun, and for the first time set up the alleged fraudulent representations as to possession by the Ryders, and as to Ryder's residence, which possession he had established, and which reidence he had disproved, by the very judgment secured by him at least six years previous. On such a state of facts, those succeeding to Attrill's interest ask the court to decree that the contracts of conveyance and the mortgage be rescinded for fraud.

What is the rule of law applicable to the rescission of contracts induced by fraud? If a person elect to rescind a contract for such cause, he must do so promptly, upon the discovery of the fraud, and, if he continue the use and occupation of the property received under the contract, he will be deemed to have elected to affirm it. Upton v. Tribil-

cock, 91 U. S. 45, 54; Schiffer v. Dietz, 83 N. Y. 300; Strong v. Strong, 102 N. Y. 73, 5 N. E. 799; Pryor v. Foster, 130 N. Y. 171, 29 N. E. 123. What did Attrill do? If any fraudulent and false representation was made, he learned thereof in 1880; he retained possession thereafter; suffered or contrived a sale on foreclosure; repurchased; paid a large sum of money on such purchase, and arranged that the purchase-money mortgage should be given; co-operated with the alleged wrongdoer to defeat the state's claim, and in conjunction with him settled the same; he answered in the foreclosure suit, and alleged in the cross bill that he held under the alleged fraudulent contract, or under the conveyance given pursuant thereto; he made no offer before suit, or in any pleading in suit, to surrender the possession which he had received under the contract, and consequent conveyance, but did not ask that the purchase-money mortgage be canceled, to the end that he be left in undisturbed possession of land. That is, he sought to continue the possession which he had acquired under the contract, and vacate the obligation to pay therefor. If Attrill ever had a right to rescind the contract, he waived it by his acts and conduct.

But it is argued that Attrill's waiver of the fraud did not and could not affect Gates, and cases involving usurious mortgages are invoked. These decisions hold that the usurious mortgage by acts of the mortgagor may become valid in the hands of a subsequent bona fide purchaser thereof, but not so as to take precedence of judgment liens attaching intermediate the inception and purchase of the mortgage. Usurious contracts are void, and cannot be validated by the mortgagor, save by an estoppel in pais operating in favor of a bona fide purchaser of the mortgage. But, even if such rule were applicable, Attrill had lost the right to ask a court of equity to rescind the conveyance, and the mortgage given thereunder, before the liens of the judgment attached, and much the more before the title was obtained from the state, or before the date of Parkin's purchase. A judgment creditor, securing a lien at least five years after the judgment debtor knew of the alleged fraud, and four years after he took title again from the same grantor on foreclosure of his first purchase-money mortgage, stands in no such privity to the estate that he can rescind the fraudulent contract, especially when his debtor had lost the right before his lien accrued. Such creditor would thereby be accredited with rights that his judgment debtor did not have, and would have power of rescinding the contract in a court of equity, after the debtor had lost such right by his laches and confirmation of the contract. If an owner of property is induced by fraudulent representations to convey the same, it may be that an assignee of his property for the benefit of creditors would have the right to avoid the conveyance. Such was the case of McMahon v. Allen, 35 N. Y. 403. In such case the cause of action passes to the assignee. But if a person by fraudulent representations be induced to purchase property, and give back a mortgage for the purchase money, the vendee's judgment creditors cannot maintain that the cause of action for the fraud runs to them, and that they may assert the fraud and annul the mortgage, but keep the land, and that the vendor cannot discharge his claim therefor. If the debtor is unwilling or neglects, until his remedy has been lost, to disturb the transaction, subsequent creditors cannot

do so, and the cause of action in equity is extinguished.    Graham v. Railroad Co., 102 U. S. 148.

A discussion of the statute embodied in section 362 of the Code of Procedure of New York is not necessary, in view of the conclusions already reached.    However, it seems to this court that such statute was not available as a defense to the action of ejectment brought by the state.    The Code (section 362) provides that the people will not sue for lands, or the profits thereof, by reason of right or title in them, "unless (1) the cause af action accrued within forty years before the action is commenced; or (2) the people, or those from whom they claim, have received the rents and profits of the real property, or of some part thereof, within the same period of time."

The Revised Statutes (2 Rev. St. p. 292, § 1) were essentially the same, save that the period of time was 20 years, and the words "such right or title," instead of the words "the cause of action," were used. The rule, as embodied in 1 Rev. Laws, 1813, p. 184, § 1, had this added provision: "And in every case where such title should not have accrued within the time aforesaid, unless such rents and profits shall have been received as aforesaid, the person * * * holding such lands * * * shall freely hold and enjoy the same against the said people, and also against all persons claiming by or under them. * * *" In Wendell v. Jackson, 8 Wend. 183, and People v. Denison, 17 Wend. 312, it was determined that proof that the premises were vacant and unoccupied, within the period necessary to be shown to establish an adverse possession against the people, is prima facie sufficient to entitle the people to recover.    See, also, La Frombois v. Jackson, 8 Cow. 589. It was decided in People v. Van Rensselaer, 8 Barb. 189, and People v. Livingston, Id. 253, that, in order to bar an action of ejectment in favor of the people, the defendant, or those under whom he claims, must show title or continuous possession of the premises for 40 years. People v. Arnold, 4 N. Y. 508, like the cases already cited, was decided under the Revised Laws (page 184, § 1), and it was held that a title in the people, accruing more than 40 years before suit brought, was not defeated, unless the land had been held for that period in hostility to the title, and that the people must be deemed to have received the rents and profits of wild and uncultivated lands, which were not in the actual possession or enjoyment of some one, as the title would draw to it the constructive possession.    This case is cited as apparently authoritative in People v. Van Rensselaer, 9 N. Y. 291, 329, 343, and also in People v. Rector, etc., of Trinity Church, 22 N. Y. 44.    However, in the latter case, it was held that "there is no presumption of title in favor of the people against the actual occupant of land until it is shown that the possession has been vacant within 40 years."    "On the contrary," it is said, "the only presumption which can be admitted is that during all the period which is a blank, according to the evidence, the condition and occupancy of the property were the same as they are proved to have been at the commencement and the close of the period."    In Railroad Co. v. Slaight, 49 Hun, 35, 1 N. Y. Supp. 554, it is stated in the opinion that "the possession of a defendant, to render the statute effectual to bar a recovery, must be hostile; otherwise the people will be deemed to have received the rents and profits."    It is also stated that the burden is on

the people to show a title accruing within 40 years, and also that the land had been vacant within the prescribed period, or that within that time they have received the rents and profits.

None of these cases were decided under the present section 362 of the Code. By its provisions it must appear that the cause of action arose within 40 years, rather than that the title accrued within the stated period. What is meant by "cause of action"? Obviously that at some time previous to the action the people acquired the title, and that some person is wrongfully withholding the possession from the people, and that such wrongful withholding has not continued on the part of the present occupant or his predecessors to whom he stands in privity of estate for the period of 40 years before the action was begun. The New York Code of Civil Procedure (sections 370, 371) states what shall constitute adverse possession. The land in question has not been "usually cultivated or improved," nor "protected by a substantial inclosure," nor "used for the supply of fuel or fencing timber, either for the purposes of husbandry or for the ordinary use of the occupant"; nor has there been, so far as the evidence in this action shows, an actual occupation under a claim of title during the full period of 40 years preceding the action by the state. It may be that various persons have claimed the ownership and asserted rights of possession, but there has been no exclusive assertion of such claim by persons who stand to each other in the relation of privity of estate. By using the words "cause of action," it is the evident purpose to protect unoccupied lands of the state, of which it may have acquired title at a period more than 40 years previous to the time of action, and indulging the presumption that such title carries possession, unless it appear that there has been a possession inconsistent with the state's ownership, which has continued for the space of 40 years.

It follows from the views herein expressed that the complainants in the foreclosure action should have the usual decree of foreclosure, with costs against the defendants contesting such action, and that the cross bills should be dismissed, with costs to the defendants contesting the same.