VAN WAGONER, v. WHITMORE et al. (STATE, by
STATE BOARD OF LAND COMMISSIONERS,
Intervener).

No. 3613.   Decided May 9, 1921.   Rehearing Denied July 15, 1921.
(199 Pac. 670:)

1. ADVERSE POSSESSION—PLAINTIFF HAD BURDEN OF SHOWING WHY STATUTES OF LIMITATION PLEADED BY DEFENDANTS WERE INAPPLICABLE. In ejectment, in which the defendants claimed title by adverse possession under Comp. Laws 1917, §§ 6446, 6447, 6449, 6450, the plaintiff had the burden of showing why such statutes did not apply.

2. EVIDENCE—JUDICIAL NOTICE TAKEN THAT STATE LAND IS NOT TAXED. The court will take judicial notice of the fact land was not taxed as long as the title remained in the state.

3. ADVERSE POSSESSION—NOT APPLICABLE TO LANDS GRANTED BY UNITED STATES TO STATE FOR COMMON SCHOOLS. Title to land granted to the state by the Enabling Act (Act Cong. July 16, 1894), for the support of the common schools in the state, cannot be acquired by adverse possession as against the state under Comp. Laws 1917, §§ 6446, 6447, 6449, 6450, in view of section 10 of the Enabling Act, and in view of Const. art. 10, § 3, art. 20, § 1, though the state sold the land under section

Appeal from Seventh District

5575, such statutes of limitation having no application to land granted by Congress for the support of common schools.[1]

4. EJECTMENT—COUNTERCLAIM FOR IMPROVEMENTS HELD INSUFFICIENT. In ejectment against defendants, who had been in possession while the land belonged to the state, counterclaim for value of improvements placed on land by defendants, under Occupying Claimant Statute (Comp. Laws 1917, §§ 5031-5038), *held* insufficient, in that it failed to show that defendants' possession was under color of title in good faith, under section 5035, or under state land laws administered by state board of land commissioners.

5. EJECTMENT—MEASURE OF DAMAGES FOR DETENTION STATED. In ejectment a measure of damages against defendant for detention of property is the rental value of the land in the condition it was in during the period for which damages are claimed.

6. APPEAL AND ERROR—FINDINGS ON CONFLICTING ·EVIDENCE NOT REVIEWED. Appellate court will not review findings on conflicting evidence though its own views as to the weight of the evidence might not agree with those of the trial court.

7. EXECUTORS AND ADMINISTRATORS—STATUTES RELATING TO CLAIMS HELD INAPPLICABLE TO CLAIMS FOR DAMAGES FOR DETENTION OF LAND. Comp. Laws 1917, §§ 7648, 7657, relating to claims against the estate of deceased arising upon contracts, *held* inapplicable to a claim for damages for detention of land, such statutes having no reference to claims for damages arising from tortious acts.

On Rehearing.

8. APPEAL AND ERROR—JUDGMENT ON FINDINGS SUSTAINED BY SUBSTANTIAL EVIDENCE AFFIRMED. If there is any substantial evidence to sustain the findings, the judgment should be affirmed.

9. EVIDENCE—COURT WILL NOT TAKE JUDICIAL KNOWLEDGE AS TO PRODUCTION OR COST OF HARVESTING, ETC., OF LUCERN. The Supreme Court will not take judicial notice that land will not produce two tons of lucern per acre without irrigation, or that market value of lucern would not be $15 per ton, or that the cost of harvesting, bailing, and preparing it for market would exceed $5 per ton.

---

[1] *Pioneer Investment and Trust Co.* v. *Board of Education*, 35 Utah, 1, 99 P. 150, 136 Am. St. Rep. 1016.

Appeal from District Court, Seventh District, Carbon County; *Geo. Christensen*, Judge.

Action by A. D. Van Wagoner against J. W. Whitmore, administrator of the estate of George C. Whitmore, deceased and another in which the State of Utah, by its State Board of Land Commissioners, intervened. Judgment for plaintiff, and defendants appeal.

AFFIRMED.

*A. R. Barnes* and *D. N. Straup*, both of Salt Lake City, for appellants.

*Ferdinand Ericksen* and *Thos. L. Mitchell*, both of Salt Lake City, and *M. P. Braffet*, of Price, for respondent.

*Harvey Cluff*, Atty. Gen., and *Herbert E. Smyth*, of Salt Lake City, for intervener.

THURMAN, J.

This is an action in ejectment to recover possession of a part of section 2, township 15 south, of range 13 east, of the Salt Lake base and meridian, situated in Carbon county, Utah, and damages for detention of the property.

The action was originally commenced against George C. Whitmore and Peter C. Jones. The answer of these defendants disclosed the fact that Whitmore claimed ownership of the property by adverse possession, and that Jones was Whitmore's agent merely, and claimed no other interest.

The quantity of land claimed by Whitmore is 56.68 acres. By their amended answer defendants rely on certain statutes of limitation as the same are found in the Compiled Laws of Utah 1907, in force when the action was commenced. These statutes now appear in Comp. Laws Utah 1917 as sections 6446, 6447, 6449, and 6450.

The state of Utah, by its Board of Land Commissioners

(hereinafter called Board), having sold the land in controversy to plaintiff in accordance with proceedings had under the statutes relating to the disposal of state lands, conceived the idea that the state was an interested party and should be permitted to intervene. The intervention was allowed, and a complaint in intervention filed by the Board.

The pleadings are prolix, but the issues free from complications.

Without attempting to state in detail the various allegations of the pleadings, or even the substance thereof, in this connection it is sufficient to state that the plaintiff claims title under a patent from the state issued by the Board. J. W. Whitmore, as administrator, successor to George C. Whitmore, who died after the action was commenced, claims title by adverse possession under the statutes above referred to, while the state, as intervener, in defense of plaintiff's title, contends that the statutes of limitations relied on by defendants have no application to the case.

The complaint in intervention sets out in minute detail various grounds upon which the state challenges the validity of the defense interposed by the defendants. The grounds relied on by the Board, and the reply thereto, as far as the same are material, will appear later on in our discussion of the questions involved.

After the substitution of J. W. Whitmore, administrator, as defendant, he was permitted by the trial court to amend his answer and file a counterclaim for the value of the improvements placed on the land by his intestate in the event that it should be adjudged that plaintiff is entitled to the property. The court to whom the case was tried without a jury found the issues in favor of the plaintiff, both for the possession of the land and damages for its detention, and refused to allow the value of the improvements claimed by the defendants in the counterclaim.

Judgment was accordingly entered for plaintiff, and defendants appeal. Many errors are assigned, and the same will be considered as far as necessary to the determination of the questions involved.

While the question of damages claimed by respondent and the value of the improvements claimed by appellant Whitmore, in the event that respondent, Van Wagoner, is adjudged to be entitled to the property, are questions that must be determined, it is conceded by all parties to the action that the controlling and overshadowing question is, Are the lands in controversy subject to the statutes of limitations relied on by appellants and can title thereto be acquired by adverse possession? If these questions must be answered in the affirmative, the judgment of the trial court should be reversed; if answered in the negative, then questions relating to respondent's damages and value of improvements claimed by appellants must be determined.

As the statutes of limitation specifically pleaded and relied on by appellants constitute the foundation of their defense to respondent's action, they are deemed of sufficient importance in this connection to quote at length for the convenience of the reader. The quotations are made from the Compiled Laws of Utah 1917:

"6446. The state will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title * * * to the same, unless:

"1. Such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced; or,

"2. The state or those from whom it claims shall have received the rents and profits of such real property, or some part thereof, within seven years.

"6447. No action can be brought for or in respect to real property by any person claiming under letters patent or grants from this state, unless the same might have been commenced by the state as herein specified, in case such patent had not been issued or grant made."

"6449. No action for the recovery of real property, or for the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, grantor, or predecessor was seized or possessed of the property in question within seven years, before the commencement of the action.

"6450. No cause of action, or defense or counterclaim to an action, founded upon the title to real property or to rents or profits out of the same, shall be effectual unless it appears that the person prosecuting the action, or interposing the defense or counterclaim,

or under whose title the action is prosecuted or defense or counter-
claim is made, or the ancestor, predecessor, or grantor of such
person was seized or possessed of the property in question within
seven years before the committing of the act in respect to which
such action is prosecuted or defense or counterclaim made."

It is an undisputed fact that George C. Whitmore was in
the open and notorious occupancy and possession of the land
in question ever since long before Utah was admitted into
the Union. It is also undisputed that he inclosed the land
with a fence, made other improvements thereon, such as the
construction of water ditches, and that he cultivated the land
and produced crops thereon from year to year. There were
all the outward appearances of an adverse holding by him
under claim of right, except the payment of taxes on the land,
and, as to those, none were levied or assessed. Whether or
not it was his duty to pay taxes in any event, whether the
land was assessed or not, in order to establish a title by ad-
verse possession presents a question of law which may or may
not be necessary to determine in the case at bar, and as to
whether or not he intended to hold adversely to the state,
which at the date of its admission into the Union became the
legal owner of the property, does not appear, but for the pur-
poses of the discussion the fact may be admitted. With these
outward appearances and indications undisputed, and the
other facts assumed, it would seem that the sections of the
statute relied on afford a complete bar to respondent's action
in the present case; that is to say, taking the outward ap-
pearances above referred to, and assuming that the payment
of taxes was not required, and that the intention of Whit-
more was to hold adversely and not in subordination to the
state, the conditions seem to favor the contention of appel-
lants that respondent's right of action was barred when the
suit was commenced.

However, inasmuch as the class of land to which the land
in controversy belongs was granted to the state of Utah by
act of Congress July 16, 1894, commonly known as the En-
abling Act, for the support of common schools in the state,
respondents contend that the statutes of limitation do not
apply. Their position is best stated in the words of their own

counsel as the same appear in their printed brief filed in the case:

"Now, we do not contend that the state of Utah has not consented to a bar against the state in some matters, but we do contend that the lands involved in this controversy, being school lands, are not within the class of property as to which the state has consented to be barred, or consented to any title being acquired by adverse possession. At first blush, section 6446 et seq. might seem to justify an assumption that the state is barred as to all real property, but we contend that the nature and purpose of the school grant from the United States, the wording and spirit of the acceptance of the grant in the state Constitution, the legislative provisions to carry out and utilize the grant for the purpose for which it was granted, the necessary incidents of this trust, and the beneficent result of a faithful performance of the trust, are such that to permit a construction of said sections 6446 et seq., taking away the substance of the grant, despoiling the school fund, would be an utter violation of the terms of the trust imposed by the donor and of the solemn conditions specified in the acceptance of the grant."

Counsel for respondents then quote from section 6 of the Enabling Act (Comp. Laws Utah 1917, p. 30), the following language:

"That upon the admission of said state into the Union, sections numbered two, sixteen, thirty-two and thirty-six in every township * * * are hereby granted to said state for the support of common schools."

In the same connection they also call attention of the court to section 10 of the same act, which, as far as material here, reads:

"That the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools."

Furthermore, counsel for respondents call the attention of the court to the following provisions of the state Constitution made in pursuance of the Enabling Act:

"Article XX. Section 1. All lands of the state that have been, or may hereafter be granted to the state by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted and declared to be the public lands of the state; *and shall be held in trust*

*for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired."* (Italics ours.)

Article 10, § 3, provides that the proceeds of the sale of state lands and other lands granted for the support of common schools shall be and remain a perpetual fund, the interest only to be used. Section 5 of the same article is, substantially, to the same effect, while section 7 provides that ''all public school funds shall be guaranteed by the state against loss or diversion."

From all of these provisions of the Enabling Act and state Constitution counsel conclude that the sections of the statutes relied on by appellants are repugnant to, and in conflict with, the very spirit of the Enabling Act and state Constitution, and therefore have no application to a case involving lands granted by Congress for the support of common schools.

We have purposely indulged in considerable detail in stating respondents' position and the basis for their contention for the reason that, in view of the statutes quoted upon which appellants rely, it seems to the court that the burden rests upon the respondents to show why the statutes pleaded by appellants do not apply in the present case.

Respondents also rely on certain adjudicated cases, somewhat analogous, reference to which will be made later on. No serious contention is made by appellants that the steps taken by the Board in disposing of the land in question were not taken in strict compliance with the provisions of the statute relating to the disposal of the public lands of the state. The general powers of the Board concerning these lands are defined in Comp. Laws Utah 1917, § 5575, which, in part, reads as follows:

"The Board of Land Commissioners shall have the direction, management, and control of all lands heretofore, or which may hereafter be, granted to this state by the United States government, or otherwise, and to lands lying below the water's edge on any lake or stream to the bed of which the state is entitled, for any and all purposes whatsoever, except lands used or set apart for public purposes or occupied by public buildings, and shall have the power to sell or lease the same for the best interests of the

state and in accordance with the provisions of this chapter and the Constitution of the state."

A patent to the land in controversy was issued by the state to the respondent, Van Wagoner, June 28, 1916. It is contended by appellants, and the contention is not seriously questioned, that as early as 1887 George C. Whitmore entered into possession of this land, fenced it, cultivated it, and constructed a water ditch for the purpose of conveying water thereto, and from that time on was continuously in possession of and claiming said land as his own; that he maintained the fence and cultivated and irrigated the land down to the trial of this case. It was stipulated by counsel for the respective parties to this action that from the date of the admission of Utah into the Union no taxes had ever been assessed or levied against the land. Without such stipulation this court would undoubtedly take judicial notice of the fact that such land was not taxed as long as the title remained in the state.

It has been assumed for the purpose of disposing of the questions involved in the plea of adverse possession that appellant Whitmore's intestate, George C. Whitmore, did everything that was necessary to be done by him to establish title by adverse possession if the land in controversy is included within the class covered by the statutes upon which appellants rely. If we understand respondents' position, they practically concede the facts which we have assumed. Relying upon the fact that all the elements necessary to constitute adverse possession have been established for the full period of time required by the statute, appellants insist that the case comes within the rules declared in *Pioneer Investment & Trust Co.* v. *Board of Education,* 35 Utah, 1, 99 Pac. 150, 136 Am. St. Rep. 1016. In that case it appears the land in question had at one time been used by the board of education for school purposes, but had long since been abandoned for such purposes because more suitable for something else. Consequently it was held for sale whenever a satisfactory price could be obtained. It was sold by the board and the title warranted. Afterwards the title was contested by a corporation, claiming title by adverse possession, who refused to surrender

the property to the purchaser.   The party claiming title
under the board of education was compelled to expend money
to quiet his title and brought an action against the board on
a covenant of warranty to recover the sum so expended.   The
question of title by adverse possession formed the principal
issue.   The fact that the land had been devoted to school pur-
poses and was owned by the board of education in that capac-
ity was pleaded and relied on.   The trial court decided the
issue in favor of the plaintiff, and, on appeal to this court,
the judgment was affirmed.

There are many points of difference between that case and
the one at bar.   It is only necessary to mention two or three:
(1)   The property had long been abandoned for school pur-
poses and held for sale for other purposes when a satisfactory
price could be obtained; (2) it does not appear that the land
was, or ever had been, land the title to which was in the state;
(3) it does not appear that the land was, in any sense, within
the provisions of the Enabling Act or of the state Constitu-
tion, upon which respondents rely in the instant case, and
hence it is difficult to see how the case in any manner meets
the contention made by respondents.   Appellants also cite
and rely on the following cases in support of the proposition
that title to the land in controversy may be acquired by ad-
verse possession:   *Schneider* v. *Hutchinson,* 35 Or. 253, 57
Pac. 324, 76 Am. St. Rep. 474; *Hamilton* v. *Fluornoy,* 44 Or.
97, 74 Pac. 483; *Ambrose* v. *Huntington,* 34 Or. 484, 56 Pac.
513; *State* v. *Schmidt,* 180 Ala. 374, 61 South. 293; *State* v.
*Schmidt,* 232 U. S. 168, 34 Sup. Ct. 301, 58 L. Ed. 555; *Mil-*
*ler* v. *State,* 38 Ala. 600; *People* v. *Banning Co.,* 167 Cal.
643, 140 Pac. 587; *Redwood County* v. *Winona,* 40 Minn. 512,
42 N. W. 473; *School Directors* v. *Georges,* 50 Mo. 194; *Burch*
v. *Winston,* 57 Mo. 62; *Whitley County Land Co.* v. *Powers,*
146 Ky. 801, 144 S. W. 2; *Wright* v. *Phipps* (C. C.) 90 Fed.
556; Id. 98 Fed. 1007, 38 C. C. A. 702; *Bullard* v. *Hollings-*
*worth,* 140 N. C. 634, 53 S. E. 441.   It would be impossible,
within reasonable limits, to carefully review and distinguish
all of these cases.   We shall endeavor, however, to give care-

ful attention to such as appear to be in any sense analogous to the present case.

In *Schneider* v. *Hutchinson*, supra, the action was to recover possession of certain land granted by Congress to the state of Oregon for the use of schools. The evidence disclosed the fact that the land had been occupied, possessed, and adversely held by the defendant and others for a period of more than 20 years. While the land was so possessed and occupied the board of commissioners for the sale of school lands sold and conveyed the land to the plaintiff's grantor. The court held that the action was barred by the statute of limitations and entered judgment accordingly. The appellate court affirmed the judgment. Much of the reasoning of the court in its opinion consists of a dissertation upon the fact that the statute of limitations involved in the case, which barred the action after a lapse of 10 years, applied to lands which the state held in its governmental as well as in its proprietary capacity, a doctrine which, in our opinion, is against the weight of authority. While in that case it appears that the land was granted by Congress to the state for the use of schools, it does not appear that Congress, by the same act, or at all, declared, as in the grant to the state of Utah, that the proceeds of the land granted should be and constitute a permanent school fund, the interest of which only should be expended for the support of schools. Neither does it appear that the state expressly accepted the lands in trust for the people with the solemn declaration that they should be disposed of as provided by law for the purposes for which they had been granted, or that the state guaranteed the fund arising from the sale thereof against loss or diversion. In short, no such provisions and restrictions as those existing in the Utah Enabling Act and Constitution are found in the Enabling Act and Constitution of the state of Oregon, or, if such provisions do exist, they were not invoked in the Oregon case now under review.

*Hamilton* v. *Fluornoy* and *Ambrose* v. *Huntington*, supra, also Oregon cases, seem to have no bearing upon the question

presented here.  They are not commented on by appellants' counsel or specially relied on.

The next case in the order of discussion is *State* v. *Schmidt,* 180 Ala. 374, 61 South. 293.  The case was an action in eject- ment brought by the state of Alabama to recover possession of certain school lands.  The case was heard in the trial court upon an agreed statement of facts.  The question was whether the sixteenth section of school lands in the state of Alabama was within the statute permitting title to be acquired by ad- verse possession under color of title.  The trial court entered judgment for defendant, and the state appealed to the state Supreme Court, which affirmed the judgment.  What is meant in the stipulation by ''color of title'' does not appear. We shall, however, consider the case as if that term had been omitted.  The grant by Congress of the sixteenth section of every township for the use of schools was, in substance, the same as the provision contained in section 6 of the Utah En- abling Act, heretofore quoted, except that the grant was made to the inhabitants of the township instead of to the state. That distinction, however, is immaterial inasmuch as the court held that, the inhabitants of the township being with- out legal entity, the legal title vested in the state for the benefit of those for whom it was intended.  The state accepted the grant.  The terms employed in the acceptance are not stated in the opinion.  It is stated, however, that ''the Consti- tution of 1819, and its several successors, have pledged the good faith of the state in the premises.''  It also appears in the opinion that the Constitution provided that such lands should be preserved from ''waste and damage.''  As far as appears in the opinion of the court, the grant by Congress did not provide that the fund arising from the proceeds of said lands should constitute a permanent school fund the in- terest of which only should be expended for the support of schools; nor is it shown that the Constitution of the state guaranteed the proceeds of the land—the funds arising from the sale thereof—against loss or diversion.  These distinc- tions, in the judgment of the court, are of vital importance in arriving at a correct conclusion.  In the Alabama case it

seems that Congress manifested no concern whatever as to the proceeds of the land or the fund arising from the sale thereof. That question it left entirely to the state, while in the case of Utah the Enabling Act followed the land down to its very proceeds, and declared that they should constitute a permanent fund, the interest of which only should be expended for the support of schools.

The Alabama court in deciding the case appears to have been controlled by the principle enunciated in the case of *Cooper* v. *Roberts,* 18 How. 173 (15 L. Ed. 338), in which the court, speaking of grants made to the state for educational purposes, at pages 181-182 of the report, says:

"The trusts created by these compacts relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive. In the present instance the grant is to the state directly, without limitation of its power, though there is a sacred obligation imposed on its public faith."

The case was appealed to the Supreme Court of the United States in which court the judgment was affirmed. 232 U. S. 168, 34 Sup. Ct. 301, 58 L. Ed. 555. Being a mere matter of "municipal concern," if the Alabama court had held that the state statute of limitations did not apply the federal Supreme Court would, no doubt, have affirmed the judgment just the same. This much can be said without the slightest reflection upon the high character of that distinguished tribunal. While we have noticed some distinctions between this case and the Alabama case, it by no means follows that we rely upon these distinctions alone. We seriously doubt if this court should follow the lead of that court on the question presented here, even if the distinctions did not exist. It does seem to us that where a state accepts a trust concerning land of the nature described in the Alabama case, and pledges its faith to an execution of the trust, such land, under the "sacred obligation imposed on its public faith," by reasonable construction should be excepted from the operation of ordinary statutes of limitation. However, it is neither the province nor inclination of this court to criticize or find fault with the courts of a sister state in construing statutes relating to the munic-

ipal concerns of their own state. The decisions of such courts, while always persuasive, are in no sense binding. The same may be said concerning decisions in such cases rendered on appeal by the highest court in the land, where such decisions simply follow the lead of those rendered in the court below, relating to their own "municipal concerns."

The Oregon case and the Alabama case are the only cases relied on by appellants that in any sense attempt to meet the contention made by respondent that the Utah Constitution and Enabling Act exclude the idea that title to school lands granted by Congress may be acquired by adverse possession. We shall therefore not occupy time and space in reviewing the other cases cited by appellants.

Questions almost identical with the question presented here have been determined by the courts of last resort of the states of Minnesota and Washington adversely to appellants' contention. *Murtaugh* v. *C., M. & St. P. Rd. Co.,* 102 Minn., 52, 112 N. W. 860, 120 Am. St. Rep. 609; *O'Brien* v. *Wilson,* 51 Wash. 52, 97 Pac. 1115.

It is not necessary to comment on these cases; they speak for themselves. In the Minnesota case the syllabus, consisting of less than three printed lines, reflects the opinion of the court.

"Title to lands granted to the state of Minnesota for the use of its schools by the United States cannot be acquired by adverse possession, as against the state."

At pages 54 and 55 of 102 Minn., at page 861 of 112 N. W. (120 Am. St. Rep. 609), the opinion, with greater perspicuity than we are capable of, states the whole case:

"The statute, making statutes of limitations applicable to the state, to which reference has been made, must be construed with reference to the school land grant and the provisions of the state Constitution accepting the grant and providing for the sale of the land. Section 18 of an act of Congress entitled 'An act to establish the territorial government of Minnesota,' passed March 3, 1849 (9 St. 408, c. 121), known as the 'Organic Act of Minnesota,' reserved sections 16 and 36 of every township for the purpose of being applied to schools of the territory and future state. This was supplemented by section 5 of the act of Congress passed February 26, 1857 (11 St. 167, c. 60), authorizing the people of Minnesota to form a

state government. This section granted to the state sections 16 and 36 of the public lands in every township within the state for the use of schools, provided the grant should be accepted by the constitutional convention, and, if it were, then its terms should become obligatory on the United States and the state of Minnesota. The convention, and the people of the state by their approval and ratification of the Constitution, accepted the grant of sections 16 and 36 for the use of the schools of the state, and safeguarded the trust by providing that the proceeds of such trust lands should remain a perpetual school fund, and that no portion of the lands should ever be sold otherwise than at public sale. Const. (Minn.) art. 2, § 3, and article 8, § 2. Our school land grant, then, was not made to the state, in its proprietary capacity, but in trust, for the explicit purpose of having the lands applied to the use of the schools of the state. This was the substantial consideration for the grant which induced the United States to make it. The state accepted the trust, and by its Constitution solemnly covenanted with the United States to apply the granted lands to the sole use of its schools, according to the purpose of the grant, and prohibited the sale of any portion of the granted land except at public sale. Such being the nature of the title of the state to its school lands, it is unthinkable that the Legislature intended by section 12, c. 66, G. S. 1866, and later acts amending it, to provide a way whereby the trust as to any of the school lands might be defeated, and title thereto acquired by adverse possession, contrary to the mandate of the Constitution that title thereto could only be obtained by a public sale thereof."

The concluding paragraph of the opinion, commencing on page 55 of 102 Minn., on page 862 of 112 N. W. (120 Am. St. Rep. 609), is equally perspicuous, and expresses the mind of the court in terms that cannot be misunderstood:

"We are, then, of the opinion that, if the statute under consideration must be construed as authorizing the acquisition of title to the school lands of the state by adverse possession, it violates in this respect, not only the terms of the grant, but also the Constitution of the state. We are, however, of the opinion that the statute fairly may be given a construction which is consistent with the terms of the school land grant and the provisions of the state Constitution applicable thereto. If the statute be read in connection with the general and well-understood rule of law that title to public land cannot be acquired by adverse possession, the history of our school land grant, the nature of the title of the state to its school lands, and the mandates of our Constitution with reference to them, it is clear upon the face of the statute that the Legislature did not intend to provide for the acquisition of the title to school lands by adverse

possession. We accordingly hold that title to lands granted to the state of Minnesota for the use of its schools by the United States cannot be acquired by adverse possession, as against the state."

Practically every word of that opinion is as applicable to the conditions existing here as they were to the case in which the opinion was rendered. Counsel for appellants make an ingenious attempt to distinguish that case from this because the Constitution of Minnesota provides that no portion of the lands should ever be sold otherwise than at public sale. How abortive this attempt to distinguish the cases must appear when our attention is called to the fact that the Utah Constitution provides that the lands ''shall be held in trust for the people, *to be disposed of as may be provided by law for the respective purposes for which they have been or may be granted.''* (Italics ours.) This language is an absolute limitation upon the power of the state to dispose of the lands, or permit them to be disposed of, except for the purpose for which they were granted by Congress. Is it conceivable, in the face of such a constitutional provision, that the Legislature could have intended its statutes of limitation to apply to such lands? It is our solemn duty to hold that such could not have been the legislative intent. When to the constitutional provision last quoted we add the further provision that the state of Utah guarantees the proceeds of these lands against loss or diversion, thus making itself an insurer and in honor bound to make good any loss that the schools might sustain by diverting these lands, or permitting them to be diverted, to other purposes, the conclusion becomes irresistible that the statutes of limitations have no application to the land in question.

In *O'Brien* v. *Wilson*, supra, which was also a case in which an attempt was made to acquire title, by adverse possession, to school lands granted by Congress to the state, the syllabus in the Pacific Reporter reads:

"Ballinger's Ann. Codes & St. § 4807 (Pierce's Code, § 1519), making limitations prescribed by the chapter applicable to actions by the state, etc., the same as to actions between individuals, does not authorize acquisition of title to school lands by adverse possession, since such construction would make the section repugnant to Enabling Act (Act Feb. 22, 1889, c. 180, 25 Stat. 679) § 11, and

Const. art. 16, § 2, requiring all school lands to be disposed of at public sale, etc., and Const. art. 16, § 1, declaring that all public lands granted to the state shall be held in trust for all the people," etc.

In the concluding sentence of its opinion, at page 57 of 51 Wash., at page 1117 of 97 Pac., the court says:

"In the language of the Supreme Court of the United States [*Northern Pac. Ry. Co.* v. *Townsend*, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044], 'this being the nature of the title to the land granted for the special purposes named, it is evident that to give such efficacy to a statute of limitation of a state as would operate to confer a permanent right of possession to any proportion thereof upon an individual for his private use would be to allow that to be done by indirection which could not be done directly'; and to permit title to school lands in this state to be acquired indirectly by adverse possession would be repugnant to the laws of the United States and the Constitution of the state."

All of which applies to the instant case with equal force and effect.

Counsel for appellant's undertake to distinguish the Washington case the same as they did the Minnesota case, and our answer to the attempt so made must be the same as it was in the Minnesota case. The provisions of the Enabling Act and the state Constitution are, of themselves, a sufficient answer, even if there were no adjudicated cases supporting the views herein expressed.

It is unnecessary to prolong the discussion. The plea of the statutes of limitations and the claim of title by adverse possession should not prevail.

Having reached the conclusion that appellants' plea of adverse possession should not prevail for the reasons hereinbefore stated, it is unnecessary to determine the 3 questions of estoppel and res adjudicata raised by respondent, or whether it was necessary to pay taxes on the land in order to acquire title by adverse possession.

The remaining questions to be determined relate to appellants' counterclaim for the value of alleged improvements on the land, and damages awarded plaintiff for detention of the property. These questions will be disposed of in the order above stated.

The counterclaim was filed April 10, 1918, in which, among other things, it is alleged that George C. Whitmore, appellants' predecessor in interest, entered into possession of the land in controversy in 1879 or 1880 in good faith, claiming and asserting right and title thereto, and ever since and until his death remained in open, notorious, peaceful, uninterrupted, visible, and exclusive possession thereof, under color of title, and in good faith believing, claiming, and asserting that he had a good title thereto, and that he held, possessed, occupied, and cultivated said land adversely to plaintiff and his predecessor in interest, and made permanent and lasting improvements thereon, as follows: Grubbing, clearing, and plowing the land, $2,000; leveling, cultivating, and seeding the land, $500; constructing and maintaining a fence upon the land, $1,000; constructing and maintaining dams, ditches, and canals for the purpose of irrigating the land, $1,000. It is then reiterated that his occupancy of the land and improvements made thereon were under color of title, and in good faith believing that the premises were his own, and adverse to plaintiff and his predecessor in interest. It is further alleged that the land without the improvements was of the value of $100,000.

The foregoing constitutes the substance of appellants' counterclaim, on the face of which we feel justified in assuming that the pleader had in mind the Occupying Claimant Statute (Comp. Laws Utah 1917, §§ 5031 to 5038, inclusive), and sought to bring the claim within the provisions of those sections.

Both plaintiff and intervenor filed general and special demurrers to the counterclaim, alleging as special grounds, among other things, that defendant sought to assert a right as an occupying claimant, under the occupying claimant statute, without pleading facts sufficient to bring such claim within the provisions of said law, in that the counterclaim failed to allege that either he or his predecessor in interest settled upon or occupied the land claimed for a period of three years under or by virtue of any law or contract with the proper officers of the state for the purchase thereof, or

under any law or by virtue of any purchase from the United States. It is also alleged in the demurrer that the counterclaim is ambiguous in that it cannot be ascertained therefrom when the alleged improvements were made, what constituted the alleged color of title, or the alleged good faith under which the property was occupied or improved, or the facts and circumstances upon which appellants' predecessor in interest based his alleged belief that he had a good title to the land. It is also alleged that for the same reason the counterclaim is unintelligible and also uncertain.

The demurrer to the counterclaim was sustained. Appellants assign the ruling of the court thereon as error, and call our attention to the following cases in support of their contention: *Gibson* v. *Fields,* 79 Kan. 38, 98 Pac. 1112, 20 L. R. A. (N. S.) 378; 131 Am. St. Rep. 278, 17 Ann. Cas. 405; *Croskery* v. *Busch,* 116 Mich. 288, 74 N. W. 464; *Devine* v. *Charles,* 71 Mo. App. 210; *Sherman* v. *Cook Co.,* 98 Mich. 61, 57 N. W. 23; *Dietzler* v. *Whilhite,* 55 Kan. 200, 40 Pac. 272; *Hentig* v. *Redden,* 1 Kan. App. 163, 41 Pac. 1054; *Hentig* v. *Collins,* 1 Kan. App. 173, 41 Pac. 1057. None of the cases have any bearing upon the objections raised by the demurrer. The demurrer not only makes the point that appellant Whitmore, in his attempt to claim under the occupying claimant statute fails to state facts to bring his claim within the provisions of the law, but the demurrer specifically challenges the sufficiency of the allegations of the counterclaim respecting good faith and color of title. These objections raised by the demurrer are not in any manner discussed by appellants' counsel in their brief, nor in the cases upon which they rely. In every one of these cases there is something which is generally recognized by the authorities as constituting color of title and something as indicating good faith. In the instant case, in view of the fact that the improvements for which compensation is demanded were made while the title to the land was in the government of the United States, with no contract for the purchase thereof, how can it be contended that appellants' predecessor in interest made the improvements in good faith under color of title believing that he was

the owner of the property and had title thereto? *Deffeback* v. *Hawke*, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423. This question was fairly presented by respondent's demurrer and argued in the brief, and, under the circumstances of the case, in our opinion was of sufficient importance to call for a responsive answer. But this is not the strongest objection raised by the demurrer. The land in question was land belonging to the state. The law, as we understand it, provides two remedies in which an occupant of state land, under color of title, in good faith, may recover the value of his improvements. One is under the state land laws administered by the State Board of Land Commissioners; the other under Comp. Laws Utah 1917, § 5035, which is part of the Occupying Claimant Law, and reads as follows:

"When any person has settled upon any real estate, and occupied the same for three years under and by virtue of any law or contract with the proper officers of the state for the purchase thereof, or under any law of, or by virtue of any purchase from the United States, and shall have made valuable improvements thereon, and shall be found not to be the owner thereof, or not to have acquired a right to purchase the same from the state or the United States, such person shall be an occupying claimant within the meaning of this chapter."

It will not be contended by appellants that the counterclaim states a cause of action under any of the laws above referred to.

We are clearly of the opinion that the counterclaim does not state sufficient facts to constitute a cause of action, and that the demurrer thereto was properly sustained.

The trial court awarded plaintiff damages for the detention of the property in the sum of $2,280 for the years 1912 to 1916, inclusive. Appellants insist that the damages are excessive, and that the judgment therefor is not sustained by the evidence. They contend as matter of law that the correct measure of damages in this case is the fair rental value of the land in its native state without the improvements placed thereon by appellant Whitmore's predecessor in interest. In support of the contention they cite the Kansas cases heretofore re-

ferred to, and in addition thereto the following: *Curry* v. *Sandusky Fish Co.*, 88 Minn. 485, 93 N. W. 896; *Armor* v. *Frey*, 253 Mo. 447, 161 S. W. 829; *Little Rock* v. *Jeuryens*, 133 Ark. 126, 202 S. W. 45, and cases cited in notes 53, 19 C. J. at p. 1242. Most of these cases refer to transactions arising under occupying claimant laws for the value of improvements, and not to damages for the detention of property in ejectment cases. The cases referred to in notes 53, 19 C. J., supra, are cited in support of the text, which reads as follows:

"Although there is some authority to the contrary, the rule is that a bona fide occupant holding possession of land under color of title is not liable for the increased rental value of the land caused by improvements put upon it by himself, but that the rents must be computed upon the basis of the condition of the land when defendant took possession."

It is contended by respondents that these cases do not apply to lands the title to which is in the government of the United States, and that the alleged improvements upon the land in question passed to the state of Utah when it became a state in 1896. The following cases relied on by respondents appear to be in point: *Collins* v. *Bartlett*, 44 Cal. 371; *Blair* v. *Worley*, 2 Ill. (1 Scam.) 178; *Attridge* v. *Billings*, 57 Ill. 489; *Welborn* v. *Spears*, 32 Miss. 138; *Seymour* v. *Watson*, 5 Blackf. (Ind.) 555, 36 Am. Dec. 556; *Burlerson* v. *Teeple*, 2 G. Greene (Iowa) 542. In further support of their contention that the doctrine relied on by appellants does not apply in the instant case, respondents quote the following excerpt from the opinion of the Supreme Court of the United States in *Deffeback* v. *Hawke*, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423, heretofore cited in another connection.

"There can be no color of title in an occupant who does not hold under any instrument, proceeding, or law purporting to transfer to him the title or to give to him the right of possession. And there can be no such thing as good faith in an adverse holding, where the party knows that he has no title, and that, under the law, which he is presumed to know, he can acquire none by his occupation. Here the defendant knew that the title was in the United States, that the lands were mineral, and were claimed as such by the plaintiff, and that title to them could be acquired only under

the laws providing for the sale of lands of that character; and there is no pretense that he ever sought, or contemplated seeking, the title to them as such lands, or claimed possession of them under any local customs or rules of miners in the district."

In view of the authorities referred to, and others which we have examined, we cannot avoid the conclusion that the measure of damages in this case was the rental value of the land in the condition it was during the period for which damages are claimed. Under the facts disclosed by the record, appellants were not entitled to a reduction of the rent on account of the improvements existing on the land when Van Wagoner became entitled to possession.

The water used on the land during the period for which damages are claimed was water belonging to George C. Whitmore and was not appurtenant to the land. The question is, what was the rental value of the land, there being no water right therefor? In other words, what proportion of the rental value of the land, including the water, should be apportioned to the land alone? There is substantial competent evidence to the effect that the rental value of the land with water was from $16 to $21 per acre during the irrigation season, while the rental value of the water alone was $5 per acre. A simple mathematical computation demonstrates that the rental value of the land alone was from $11 to $16 per acre during the irrigation season. The testimony was the same for every year from 1912 to 1916 inclusive. The evidence was conflicting, and we are powerless to review the findings, even though our own views as to the weight of the evidence might not agree with those of the trial court.

But in respect to the question of damages as against the estate of George C. Whitmore, deceased, it is contended by appellants that the court erred in overruling their motion for nonsuit made when respondents rested their case. The motion was interposed on the ground that it appeared in the evidence that George C. Whitmore died pending the trial of the case, and that no proof was made that claim for damages had been presented to the administrator of his estate as provided in Comp. Laws Utah 1917, §§ 7648 and 7657. These sections read as follows:

"Sec. 7648. All claims arising upon contracts, whether the same be due, not due, or contingent, must be presented within the time limited in the notice, and any claim not presented is barred forever; provided, that when it is made to appear by the affidavit of the claimant, to the satisfaction of the court or judge thereof, that the claimant had no notice as provided in this chapter, by reason of being out of the state, it may be presented at any time before a decree of distribution is entered; provided further, that nothing in this title contained shall be so construed as to prohibit the foreclosure of liens or mortgages as hereinafter provided."

"Sec. 7657. If an action is pending against the decedent at the time of his death, the plaintiff must in like manner present his claim to the executor or administrator for allowance or rejection, authenticated as required in other cases; and no recovery shall be had in the action unless proof be made of the presentation required."

The sections quoted are specifically limited to claims arising upon contracts, and have no reference to claims for damages arising from tortious acts.            7

In Church's Probate Law and Practice (2d Ed., vol. 2), at page 1068, it is said:

"As the statute which relates to the presentation of claims against estates before actions can be commenced thereon relates to claims arising upon contracts, other actions do not come within the rule. Thus no presentation of a claim is necessary before the bringing of an action to recover damages for a wrongful act."

See, also, California cases under the statute from which the Utah statute was adopted. *Hardin* v. *Sin Claire*, 115 Cal. 460, 47 Pac. 363; *Leverone* v. *Weakley*, 155 Cal. at page 401, 101 Pac. 304.

The motion for nonsuit was properly denied.

We have carefully considered the various questions presented on this appeal and find no error in the record.

The judgment of the trial court is affirmed, at appellant's cost.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK, JJ., concur.

ON Rehearing.

THURMAN, J. On application for rehearing appellants contend that the court erred on the question of title by adverse possession and also as to the question of damages awarded to plaintiff.

On the first question appellants' brief is exceedingly elaborate, and if pertinent to the issues involved would be both interesting and instructive. However the argument from beginning to end is based upon a misconception of the principle upon which the court decided the case. The court did not assume that the grant to the state of the lands in question was made upon a condition subsequent or that such grant was liable to be defeated by a happening of such condition or a failure thereof. No such consideration influenced the judgment of the court, nor is any such thought or idea fairly deducible from the opinion handed down. The court in its opinion was influenced largely by the doctrine enunciated in *Cooper* v. *Roberts*, 18 How. (U. S.) pages 181, 182 (15 L. Ed. 338), cited in our opinion and also relied on by appellants, wherein the Supreme Court of the United States, in speaking of the nature of grants of land by Congress to states for school purposes, says:

"The *trusts* created by these compacts relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive. In the present instance the grant is to the state directly, without limitation of its power, *though there is a sacred obligation imposed on its public faith*." (Italics supplied.)

This court in its opinion recognized the fact that there was no limitation upon the power of the state, as far as the Enabling Act is concerned, to dispose of the lands in any manner or for any purpose whatever; that the state could even squander the lands, or give them away to its favorites without consideration, just the same as it could repudiate its just obligations and disregard every principle of honor. All this was fully understood by the court, which was also fully advised that no matter what the state did with the lands, or the

funds arising from a disposal thereof, the title would not and could not revert to the grantor by virtue of any terms of the Enabling Act. But back of all this, the court was also aware, as suggested in the excerpt quoted from the opinion in *Cooper* v. *Roberts,* supra, that there was, by the grant to the state, "a sacred obligation imposed upon its public faith" to devote the lands in question, or the proceeds arising therefrom, to the very purpose for which they were granted by Congress. Influenced by these considerations, together with the solemn pledges, guarantees, and assurances made by the state Constitution in accepting the grant, this court was compelled to determine the question once for all as to whether or not the statutes of limitation relied on by appellants apply to the lands in dispute. We came to the conclusion the statutes do not apply for the reason that such application would be repugnant to both the letter and spirit of the state Constitution, the provisions of which we have quoted at length in the opinion. The Constitution declares that such lands "shall be held in trust for the people to be disposed of as may be provided by law for the respective purposes for which they have been or may be granted." We emphasized the language just quoted, and stated that it was an "absolute limitation upon the power of the state to dispose of such lands, or permit them to be disposed of, except for the purposes for which they were granted by Congress." We reaffirm what was there stated, for we find no reason to change our opinion. If there ever was a solemn declaration of trust made by a grantee of lands and published as such to all the world, it seems to us that this declaration is a perfect example. In view of the pledges, guaranties, assurances, and declarations of the Constitution, it must be conceded that these lands are held by the state in its governmental capacity and not otherwise. Where such is the case, ordinary statutes of limitations do not apply. To bring such lands within the operation of limitation statutes, it is extremely doubtful if anything short of an amendment to the Constitution could effect the result. It is not necessary, however, to determine that question in the instant case.

With this explanation there ought not longer to be any doubt as to the grounds upon which we based our opinion. Believing, as we did, that by the Enabling Act the state was morally bound because of the "sacred obligation imposed upon its public faith," and believing also that by the provisions of the state Consitution it was not only morally but legally bound to see that these lands or the proceeds thereof were devoted to school purposes; the court was of opinion the statutes of limitation had no application to the case.

On the question of damages the writer of the opinion, at the time it was written, believed there was substantial evidence to the effect that water for the land could be rented for the irrigation season for the sum of $5 per acre. So believing, by a simple mathematical demonstration he arrived at the conclusion that the findings of the court as to plaintiff's damages were sustained by the evidence. The opinion was accordingly prepared and rendered. When counsel for appellants filed their petition for a rehearing, and called our attention specifically to the evidence upon that point, we found it necessary to make a careful investigation, and we are not entirely satisfied that the evidence referred to justified the conclusion reached in our opinion. While there is evidence to the effect that the rental value of water for irrigation at Sunnyside was $5 per acre for the irrigation season, there is no substantial evidence that such water was available for the land in question, so that the opinion, in that respect, is subject to the criticism of appellants' counsel.

This, however, is an action at law. The purpose of the appeal is to reverse the judgment. If there is any substantial evidence to sustain the findings the judgment should be affirmed. There is evidence in the record of an entirely different character from that above referred to, which it becomes our duty to consider. One Geo. N. Hill, a witness for plaintiff, farmer by occupation, acquainted with the land in controversy and climatic conditions in that vicinity, testified that during the years 1912 to 1916, inclusive, the winter snows and rainfall in the neighborhood where the lands are situated were sufficient to produce one good crop

of lucern without irrigation; that a good crop of lucern would amount to approximately two tons per acre, that baled lucern hay during the years mentioned had a market value at Sunnyside of $15 to $17 per ton, and that the cost of cutting, raking, stacking, wiring, and baling would not exceed $5 per ton. Conceding, as contended by appellants' counsel, that there were only 38 and a fraction acres of the land in controversy that was in actual cultivation, and, taking the lowest market price per ton mentioned in the evidence referred to, the amount of damages is easily ascertained. Two tons per acre for 38 acres is 76 tons per year. This amount, multiplied by $10, the net price per ton after all costs and expenses are paid, amounts to $760 per year. For five years, from 1912 to 1916, inclusive, the amount would be five times $760, or $3,800. In addition to this, the same witness testified that after the hay was cut the land was worth $1 per acre annually for pasture, which for the five years would aggregate $190, making a total of $3,990.

This court cannot take judicial notice of the fact, or assume as a matter of common knowledge, that the land would not produce two tons of lucern per acre, without irrigation, or that its market value when baled would not be $15 per ton, or that the cost of harvesting, baling, and preparing it for market would exceed $5 per ton. If we cannot take judicial notice of these facts we are bound to accept the evidence as substantial, even though there may be those who seriously doubt its credibility.

Having considered all the grounds assigned by appellants' counsel in support of their application for a rehearing the court is of the opinion the application should be denied.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK, JJ., concur.