342 P.2d 1103

**STATE** of Utah, Plaintiff and Appellant,

v.

James L. **HATCH** and Della L. Hatch,
Defendants and Respondents.

No. 8937.

Supreme Court of Utah.

Aug. 4, 1959.

Dennis McCarthy, Sp. Asst. Atty. Gen., E. R. Callister, Atty. Gen., for appellant.

Olsen & Chamberlain, Richfield, A. Pratt Kesler, U. S. Dist. Atty., C. Nelson Day, Asst. U. S. Dist. Atty., Salt Lake City, Roger P. Marquis, Dept. of Justice, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., for respondents.

Clair M. Senior, Salt Lake City, Herbert W. Clark, Girvan Peck, San Francisco, Cal., and Edward A. Penprase, Los Angeles, Cal., amici curiae.

· McDONOUGH, Justice.

This is an action by the state of Utah to quiet title to the mineral rights in certain lands in Garfield County. Defendants counterclaimed, asserting both surface and mineral rights and asked that title be quieted in them. The lower court ruled for the defendants and the state appeals.

The lands involved in this case were originally granted to the state of Utah by virtue of Section 6 of the Utah Enabling Act. This act granted to the state of Utah, upon admission into the Union, "sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed state * * *," except that mineral lands were not so granted but other sections were to be substituted therefor. It was necessary to determine whether said sections were mineral in character which was the responsibility of the Department of Interior.[1] Title to these lands did not vest in the state until such time as the official survey of the lands had been approved by this department and land had been classified as non-mineral in character.[2] If the land later proved to be mineral in character, that did not affect the state's title to such land.

Subsequent to statehood, Congress, from time to time withdrew certain public lands in connection with conservation policies and in the creation of military and Indian Reservations. Some difficulty existed where these lands had been surveyed and certified as non-mineral so that title had vested in the state. The withdrawal itself had no effect on the title of the state to

1. Knight v. United States Land Ass'n, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974.

2. Sherman v. Buick, 93 U.S. 209, 23 L.Ed. 849; Heydenfeldt v. Daney Gold & Silver Mining Co., 93 U.S. 634, 23 L.Ed. 995; West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct. 138, 73 L.Ed. 265.

the lands but the fact that they were in the midst of federal reserves created some difficulty. The solution to the problem was simple: merely exchange the state owned land for selected federal land lying outside the reservation as agreed upon between the state and federal agencies in charge. From these exchanges the issues in the present case arose.

It is undisputed that title to the lands here in question vested in the state of Utah prior to May 24, 1897. In 1925 these lands were exchanged by the State Land Board of Utah for other lands within the state belonging to the Federal Government. In 1937 the defendant's predecessor in interest received title to this land by patent from the United States. In none of these transactions were the mineral rights reserved expressly by agreement of the parties.

A preliminary question is whether the State Land Board has authority to exchange state lands with the United States. Such authority must be found in Sections 65–1–14, 65–1–27, 65–1–70, U.C.A.1953. Section 65–1–27, supra, authorizes the Land Board "may cancel, reliquish, or release the claims of the state to, and may reconvey to the United States, any particular tract of land erroneously listed to the state, or any tract upon which at the time of selection, a bona fide claim has been initiated by an actual settler." Section 65–1–14, supra, provides that the Board has the "direction, management and control of all lands * * granted to this state * · * * for any and all purposes whatsoever, * * * and may sell or lease the same for the best interests of the state in accordance with law * *."

█ It is not questioned that the State Land Board has regarded the above sections as authorizing it to make exchanges with United States and that such has been the practice since statehood. While the construction of a statute by the administrative is not binding on the courts, it is well settled that if such construction is not out of harmony with the apparent intent, the administrative interpretation will be given some weight in applying the statutes to controversies that arise thereunder.[3]

█ In the case of State Board of Land Commissioners v. Ririe[4] the question of the power of the Land Board was in issue. With respect to it the court said: "The Legislature is presumed to know the construction placed upon the language of the act by both the Land Board and the State Auditor. Notwithstanding that fact, the Legislature has met biennially, and there have been three revisions or compilations of the statutes since the original enactment. Furthermore, the particular

---

3. Salt Lake Transfer Co. v. Barton Truck Line, Inc., 8 Utah 2d 401, 335 P.2d 829; State v. Alta Club, 120 Utah 121, 232 P.2d 759.

4. State Board of Land Com'rs v. Ririe, 56 Utah 213, 190 P. 59, 62.

section has been amended by the Legislature in 1911, 1915, and 1919. At no time, apparently, has the Legislature been dissatisfied with the interpretation of the Land Board and the State Auditor, but has given its affirmative approval by the re-enactment of the section with full knowledge of the interpretation placed upon it." This principle applies to the statutes involved in this case. Although the legislature has made minor alterations · in them since their enactment, there has never been any indication that the Land Board was exceeding its authority in the exchanges with the federal government which have been continuously going on. The doctrine of the Ririe case is in harmony with recognition of the general power of the Land Board to manage the school lands to the best advantage to provide support for the public schools. The manner in which these lands had to be dealt with in acquiring them from the federal government suggests the practical necessity of that board having authority to make such exchanges.

We next confront the critical question in this case: in the exchanges of land with the Federal Government were minerals reserved to the state subsequent to the enactment of Section 5575x, Laws of Utah, 1919 (now Section 65–1–15, U.C.A.1953).

The statute reads:

"All coal and other mineral deposited in lands belonging to the state of Utah are hereby reserved to the state.

Such deposits are reserved from sale, except upon a rental and royalty basis as herein provided, and the purchaser of any lands belonging to the state shall acquire no right, title or interest in or to such deposits, but the rights of such purchaser shall be subject to the reservation of all coal and other mineral deposits, and to the conditions and limitations prescribed by law providing for the state and persons authorized by it to prospect or mine, and to remove such deposits, and to occupy and use so much of the surface of said land as may be required for all purposes reasonably incident to the mining and removal of such deposits therefrom."

The plaintiff argues that any attempt to divest the state of its interest after the enactment of that statute is limited by it and that consequently the mineral rights therein remain in the state. The defendants rejoin that the statute had no such purpose as to the United States but was aimed only at preventing certain abuses in sales to private individuals which had been occurring prior to its enactment.

It is significant that the statute makes no mention of exchanges with the United States, but is couched only in general terms. When doubt or uncertainty exists as to the interpretation of such a general statute, it is appropriate to look to its

purpose in the light of its history and background to determine its correct application.[5]

In 1917 the legislature authorized the governor to appoint such persons as necessary to conduct an audit and investigation of state agencies for the stated purpose of uncovering discrepancies in the management or disposition of any public funds or property.[6] The State Land Board was one of the agencies of which an audit and investigation was conducted. A report of the committee appointed by the governor is contained in the house journal of the 1919 legislature,[7] of which we take judicial notice.[8] The findings of the special auditor working on this investigation show that there was great discrepancy between the value of lands sold and price received by the state. Examples are cited of favoritism practiced by the Land Board in making sales to private individuals and suggestion is made that this practice should be abated.[9]

This entire report is concerned with the abuses resulting in favoritism shown to private individuals and contains no suggestion or intimation that anything was amiss in the exchanges with the federal government.[10] It is significant that the chapter

5. Stanton Transportation Co. v. Davis, 9 Utah 2d 184, 341 P.2d 207; Norville v. State Tax Commission, 98 Utah 170, 97 P.2d 937, 126 A.L.R. 1318.
6. Page 28, S.L.U.1917.
7. Page 469, House Journal, 1919.
8. Section 78-25-1(3), U.C.A.1953.
9. Page 474, House Journal 1919. "We know that numerous sales of State lands made to individuals, who relinquished them by warranty deed to the Utah Fuel Co. before full payment was made to the State, and later patent issued to the Fuel Co. This is clearly fraud, thru dummy entry of these coal lands, and we have specific details regarding this matter."
   Page 475, supra. The auditor recommends "The sale of all State lands be suspended for a period of five years, except lands under the Carey Act project, and except that the suspension should not apply to the acquiring of homesteads by actual bona fide homeseekers and settlers, as will be outlined in a later paragraph. This suspension of sales would enable this Department to * * * To take complete stock of the lands and funds. To make actual physical appraisement of all State lands, determine their real worth and character, whether agricultural, arid, grazing, or mineral, and their natural advantages, so as to establish a price that will give to the State actual value for its lands remaining. * * * To devote the necessary time and attention toward securing definite decisions with regard to mineral rights, to institute proceedings to attempt to recover any lands which in course of the audit may be definitely decided to have been secured by fraud, and to secure any favorable National legislation possible regarding the exchange of worthless school sections.
10. Id. at page 476. Steps should be taken to secure permission to relinquish worthless desert school sections amounting to over two million acres, and to secure indemnity lands in lieu, that can be leased for grazing purposes. This will require time and effort but if successful will mean millions to the State. It has been done in some of our sister States, so why not in Utah. * * *
    Likewise, isolated school sections within the forest reserves could be traded for as nearly a compact area as possible in some certain reserve, so that proper protection may be exercised to save the State's timber from wanton destruction.

containing the section under consideration (5575x Laws of Utah 1919) was enacted by the legislature on March 13, 1919, right on the heels of the report above discussed, which was submitted to the governor on February 28, 1919, and entered in the minutes of the House March 5, 1919. The act dealt with mineral rights in state-owned lands and reserved them, "from sale" in the language of the statute as hereinabove quoted. But it made no mention of excluding exchanges with the federal government which were going on and which were spoken of favorably in the same report. From the substance of this report and the legislation which obviously resulted therefrom, it is quite apparent that the legislature intended no such reservation in such exchanges.

The subsequent history and administrative practice of the dealings with such lands also substantiate the above conclusion. In 1927 "An Act authorizing the State land board of Utah to convey certain lands to the United States for use as a migratory bird refuge and game preserve" was enacted.[11] The provisions of this act specifically reserve any and all minerals in said lands. In 1929 two acts were passed, one which provided for the release, relinquishment and conveyance to the United States of state-owned land in support of the purpose of the United States to erect the Echo Reservoir.[12] Consistent with the purpose for which this land was being conveyed to the United States, this Act contained no reservation of mineral rights. The second Act provided for the consent of the State of Utah for the use of state-owned land by the United States for a migratory bird refuge.[13] This act retained "the right of the State to dispose of any and all minerals in or upon said lands * * *." Another act was passed which reserved mineral rights to the State.[14] The only conclusion to be drawn from these express reservations and omissions in transactions involving the United States is that the legislature and the Land Board did not consider the 1919 mineral reservation applicable to automatically apply to the federal government but where it was desired to reserve such rights it was expressly provided for. The conclusion above stated finds further support in the practice followed by the Land Board in conducting its business. In making conveyances of state lands it follows the invariable practice of making express reservations of mineral rights referring to Section 65–1–15, U.C.A.1953, 5575x Laws of Utah 1919, as the basis for doing so.

The State of Washington has only recently done this.

11. Ch. 56, § 1, Laws of Utah 1927.

12. Ch. 2, § 1, Laws of Utah 1929.

13. Ch. 2, § 1, Laws of Utah 1929.

14. Ch. 144, §§ 65–1–83 to 65–1–85.

It is appreciated that the United States has followed the general practice of not permitting known mineral lands to become vested in the state. The policy was for the federal government to retain such lands and to keep them open to discovery and development of minerals by all citizens. But with respect to school sections which were certified as non-mineral the full fee simple title thereto vested in the state. This was not affected even though the lands were later discovered to be mineral. This was also true of exchanged lands. Thus if the statute in question were construed as the state contends, the exchanges would have been of state lands, reserving mineral rights to the state, for federal lands without such reservation. This obviously would not have been a fair transaction and it is doubtful whether such exchanges could have been negotiated had the federal government been on notice of any such reservation of mineral rights. When the Land Board, our legislature, the United States and landowners succeeding to its interests have all treated such exchanges as vesting fee title in the United States for a period of nearly 40 years, it would seem manifestly unfair to now permit the state to assert that it had reserved the mineral rights in all such lands. It would also cause great confusion in the titles to lands which had been so exchanged. We approve the construction of this statute adopted by the trial court: that it does not have the effect of reserving minerals to the state in lands exchanged with the federal government. This avoids unfairness and prevents chaos to land titles which otherwise would exist.

Affirmed. Costs to respondents.

CROCKETT, C. J., and WADE, J., concur.

HENRIOD, Justice (dissenting).

I dissent. Title 65–1–15 says "All coal and other mineral deposited in lands belonging to the state of Utah are hereby reserved to the state." This is clear and unambiguous. In my opinion it is an interdiction against alienation of mineral rights. Other sections do not obscure it, nor do arguments of counsel anent administrative construction, unfairness, confusion of titles, evolution of a rule of property, nor the main opinion.

1. It is urged that since the land board, before and after 1919, thought and acted as though Secs. 65–1–14, 27 and 70 gave it authority to trade school lands to the U. S. without reservation of minerals, due weight should be given to that understanding, to the end that the state be bound by any exchanges made, the full fee going to the U. S. Even so, such conclusion and conduct are no answer justifying evasion of fundamentals negating such result, because: A) Although 65–1–14 gives general control over state lands, it authorizes no exchange

with the U. S., and is subject to the provisions of 65-1-15; B) 65-1-27 has no bearing on the question as it has to do with exceptional cases of erroneous transfers; C) 65-1-70 is inapplicable as it concerns itself only with exchanges designed to "compact" state lands,—not the case here. It has to do only with individuals, not the U. S., as is apparent when it says that no exchange can be effectuated unless a patent has been issued to a proprietor; D) administrative practice over the years cannot create a non-existent authority; and E) administrative construction has judicial weight only where, not as here, a statute is ambiguous or unclear. As to this last observation, the cases cited in the main opinion are not helpful since they deal with legislation obviously ambiguous, and not clear, as here.

2. Counsel say that where a committee was appointed by a Governor to investigate land transfer abuses, resulting in a recommendation for a five-year moratorium on sales of state lands, followed by passage of 65-1-15, together with subsequent approval by him of exchanges with the U. S. without reservation of minerals, should preclude the state from asserting such a reservation under the statute. The answer is two-fold: A) Such an assertion is bottomed on an equitable defense, such as estoppel, laches and the like, not binding on a sovereign acting in its governmental capacity[1] (contention of the respondents that the state was not so acting to the contrary notwithstanding); and B) such history could be no vehicle for transmutation of non-power into power.

3. It is said further that because Secs. 851 and 852, Title 43 U.S.C.A. (Secs. 2275 and 2276 Rev.Stat.) pre-dated the Utah legislation mentioned, the latter was subject to the former and its proviso that in the event of any exchange, the state waived any rights in the land it exchanged. Fallacy of such contention is that no matter

[1]. a) Sec. 6 of the Enabling Act (28 Stat. 107), says "That upon the admission of said State into the Union, sections numbered two, sixteen, thirty-two, and thirty-six * * * are hereby *granted* to said State *for the support of common schools.*"

b) Sec. 10 of the Enabling Act (28 Stat. 107) says "That the proceeds of lands herein granted for education purposes * * * *shall constitute a permanent school fund,* the interest of which only shall be expended for the support of said schools."

c) Utah Constitution, art. XX, Sec. 1, says that "All lands of the State that have been, or may hereafter be granted to the state by Congress * * * *shall*

*be held in trust* for the people, to be disposed of as may be provided by law, *for the respective purposes* for which they have been * * * granted."

d) In Van Wagoner v. Whitmore, 58 Utah 418, 199 P. 670, 679, rehearing 58 Utah 441, 442, 199 P. 678, construing art. XX, Sec. 1, Utah Constitution, says: "If there ever was a solemn declaration of trust made by a grantee of lands and published as such to all the world, it seems to us that this declaration is a perfect example. In view of the pledges, guaranties, assurances, and declarations of the Constitution, it must be conceded that these lands are held by the state in its governmental capacity and not otherwise."

what the federal legislation might say, it cannot alter, amend or create any authority in a state agency to waive state rights if such authority has not been in existence since 1919.

4. It is urged also that to construe 65–1–15 so as to require reservation of minerals in exchanges with the U. S. would confuse titles. Such contention is not meritorious for two reasons: A) If confusion of titles is urged as a defense, it necessarily would have to be urged as an equitable defense, which would be unassertable against the state; and B) confusion of titles cannot change the complexion of a state official's or a state agency's authority.

5. Respondents also contend that the state is not entitled to minerals in the lands it exchanges, and also the full fee in those it receives in exchange, and that such exchange would not be an equivalent one. The answer to this argument is that saying the state is not "entitled" to both is but an ipse dixit. There is no reason why the state should not be entitled to both if that be the basis for the bargain. If the U. S. does not wish to trade on those terms, it may decline. If it *has* exchanged, believing it was on some other basis, there may be an equitable question involving mistake and rescission. Otherwise, the argument is unimpressive, since it is not what is fair, what will happen to titles, nor what you and I think the state is entitled to, nor what is an equivalent,—but simply how far a state agency can go under its delegated authority.

6. Another argument advanced is that 65–1–15. deals only with sales to individuals, not exchanges with the U. S.,—that "sales" and "exchanges" are not synonymous. A complete answer to such contention is that synonymity makes no difference. Secs. 65–1–27 and 70 deal with something foreign to 65–1–15, the latter being quite silent as to any kind of dealing with the U. S. as an expected transferee. In clear language it reserves minerals as against every one, and nothing therein excepts any exchange with the U. S. The other sections pertain to "erroneous" and "compact" adjustments,—neither of which is claimed in the instant case.

7. The argument that a rule of property has arisen by protracted administrative conduct can only be an argument to the effect that if you compound error long enough you may reverse it and actually establish title by such reversal, where none existed before. Decisional nonconformity of a state agency, not unknown in political history, so far as I know, never has been held to be justification for an administrative strayaway's conduct, or for binding the sovereign with such conduct in complete circumvention of a governmental function.

8. The assertion is made that this case improperly was tried, side-stepping federal questions and evidence of numerous transactions over a long period of time. The

only problems here are what authority did the legislature give to the land board, and did that agency act within that authority, and it makes no difference whether the transactions effected were one or a thousand.

9. Further, it is asserted that the legislature must have meant something other than it said, when two cases involving trades with the U. S. are cited in which mineral rights expressly were reserved, while in a third, such rights expressly were granted. Because of such circumstances in these cases, the main opinion says that "The only conclusion to be drawn from these express reservations and omissions in transactions involving the United States is that the legislature and the Land Board did not consider the 1919 mineral reservation applicable to automatically apply to the federal government but where it was desired to reserve such rights it was expressly provided for." It is arguable just as sensibly, if one is to use such reasoning, that in transactions with the U. S., the legislature intended that the reservation *should* apply, and to make sure of it, every exchange transaction should contain it, provided, that if such reservation were not intended to apply, an express exception thereto should be made, as reflected by what happened in the three cases mentioned.

The case should be reversed.

WORTHEN, J., heard argument but died before opinion was filed.